No. 13,052.

EDWARD VIVES, JR., VS. ARTHUR V. ROBERTSON.

SYLLABUS.

While it has been repeatedly held to be sufficient allegation, when supported by plaintiff's oath, to authorize the granting of the order and the issuance of a writ of sequestration, that the affiant *fears* that the defendant will conceal, part with or dispose of the property on which he asserts a privilege, during the pendency of the suit; yet it is permissible for the defendant to charge the untruthfulness of the affidavit, and upon sufficient proof to obtain the dissolution of the writ.

This is the sense of all the adjudged cases in this court.

In a settlement of accounts between landlord and tenant, and the mutual claims of the parties for and against each other, the party relying upon a contract either as supporting his own demand or disproving that of the other, carries the burden of establishing same by a preponderance of proof.

APPEAL from the Fourteenth Judicial District Court for the Parish of Pointe Coupee. *Talbot, J.*

*Olivier O. Provosty* for Plaintiff and Appellee.

*Yoist & Claiborne* and *Lazarus & Luce* for Defendant and Appellant.

The opinion of the court was delivered by

WATKINS, J. The plaintiff sues upon alleged parol contracts of lease and sale, as existing between himself and the defendant, apper-

taining to a crop of sugar. made during the year 1897; and his claim is, that there resulted from said transactions an indebtedness by the defendant to him of $2,098.00, for which he prays judgment.

He accompanied his allegation of indebtedness with averments and prayer for a writ of sequestration, and same was accordingly issued.

A few days later, he filed a supplementary petition in which some modification of the statement in his original petition was made, and an additional sum of $900.00 is claimed; and he, also, claimed and procured an additional writ of sequestration.

Thereafter the defendant filed a motion to dissolve the two writs of sequestration, upon the ground, that (1) the affidavits upon which same issued, are and were untrue; (2) that the writs issued "without legal cause or good reason."

He thereupon prayed for the dissolution of the writs, and for the assessment of $150.00 damages as attorney's fees, and $500.00 as special damages for loss of time, expenses, inconveniences, etc., and for procuring the release on bond of the property sequestered.

By agreement of parties, this motion was referred to the merits without prejudice, and the defendant filed an answer—the substance and effect thereof being that plaintiff was entitled to credit for the price of cane in the sum of $2,907.40, and was indebted to him in the sum of $2,742.89, on open account, resulting in a credit balance in plaintiff's favor of $164.51.

On the trial there was judgment in plaintiff's favor for the sum of $927.42, maintaining the writs of sequestration, recognizing the privilege of the plaintiff as seller of cane, and enforcing same against the property seized; and from that judgment the defendant prosecutes a suspensive appeal.

In this court the plaintiff and appellee has filed an answer to the appeal, and prayed for an amendment of the judgment appealed from (1) so as to allow him the full amount he claimed and, (2) to recognize and enforce his contract of lease for the full period of three years.

The substance of the plaintiff's petition is, that in January, 1897, he and the defendant entered into a contract, by which the latter leased to him one hundred acres of land on the Grand Bay and Nina plantations for a term of three years, beginning January 1, 1897; and that he bound himself to furnish to petitioner seed cane to plant thirty-

Vives, Jr., vs. Robertson.

three acres of said land, and to furnish forty acres of said one hundred acres already planted in stubble cane.

That he, also, obligated himself to purchase the sugar cane made by petitioner on said land, at not less than $2.25 per ton, and as much more as in the grinding season he would pay to any one else selling cane.

That by said contract, petitioner bound himself to take said land and cultivate, in cane, a quantity thereof thus planted, and to be planted in cane, and to sell his cane to the defendant, and to pay rent at the rate of $3.00 per acre *per annum,* and to pay for said seed cane and said stubble at the rate of $5.00 per acre actually planted; and that at the termination of said lease, the defendant was obligated by said contract to pay petitioner for the stubble and seed cane on the land, when returned, at the same price of $5.00 per acre of stubble land, that the seed cane could plant.

Plaintiff shows, that said contract was subsequently, by mutual consent, so modified, that petitioner took only ninety-five acres, instead of one hundred under the lease; and that only thirty acres of the land was planted in seed cane, instead of thirty-three as originally agreed.

That petitioner carried out his contract, and sold to defendant 1,051 tons of cane, which he accepted and manufactured; and that there are in said land eleven acres of cane, all cut and ready to be hauled and delivered, which will weigh, as petitioner believes, and therefore avers, 250 tons; and that the latter 250 tons of cane will be delivered and manufactured within the next three days in the ordinary course of operations on defendant's plantation.

And that the defendant, in the course of the grinding season now going on, purchased cane at the price of $3.00, and is indebted to petitioner for the said one hundred and fifty tons already delivered, in the sum of $3,150.00, and for the said two hundred and fifty tons in the sum of $750.00, making a total of $3,900.00.

That in April, 1897, petitioner and defendant made a further contract by which petitioner obligated himself to let the defendant have the use of his eight mules, during the grinding season; and the defendant obligated himself to take off the cane crop of petitioner at fifty cents per ton—that is to say, to take charge of said cane crop in the field, and at his own expense to attend to the cutting of same, and transporting and delivering it at the mill; and that the defendant has

no yet fulfilled said contract, in that said two hundred and fifty tons of cane have not yet been hauled and delivered.

And petitioner further shows that defendant being under the obligation to take off and deliver and purchase said cane crop for the purposes of this suit he considers said crop as good as delivered and bought by the defendant as per contract; and that the amount of two hundred and fifty tons is a low estimate, but that he reserved the right in a supplemental petition to state the facts in conformity to the figures.

He shows himself indebted to the defendant for

Rent of said land in the sum of....................................$ 285 00

For stubble and seed cane...............................................  350 00

For taking off said crop................................................  650 50

And for store account..................................................  100 00

And for other advances.................................................  417 88

    Aggregating......................................................$1803 38

Shows that he has been unable to come to a settlement, and the foregoing figures are fixed subject to settlement.

He shows further, that defendant denies that said lease was for three years, and contends it was for one year only; and, should the court sustain that contention, and hold that the lease was terminated on the 1st of January, 1898, he avers then, that for the stubble and seed cane now on said land, and belonging to him, he is entitled under said contract to have and recover from the defendant $350.00, which would offset the amount above stated as due by petitioner to the defendant for the stubble and seed cane furnished by the defendant.

Petitioner avers, that to secure the sum of $2,098.00, he has a lien and privilege on the sugar, syrup and molasses manufactured during the grinding season of 1897-1898 by the defendant to the amount of the production of the cane already manufactured, and to the amount of probable product of the said 250 tons of cane not yet manufactured; which product and probable product fully equal and amount to 200,000 pounds of sugar, plus two hundred barrels of molasses.

Petitioner fears and believes that said defendant will conceal, part with, or dispose of the sugar, syrup and molasses manufactured by him during the grinding season of 1897-1898, during the pendency of this suit; therefore, he prays as above stated.

The plaintiff appends to each of his petitions, original and supple-

mental, an affidavit in which he states that all of the facts and allegations contained in said petitions are true.

In his answer, the defendant pleads a special denial, and specially avers the truth to be, that he entered into a contract with the plaintiff for the year 1897, by which he rented to him ninety-five acres of land of the plantations mentioned, for a rental of $3.00 per acre; the respondent to furnish to plaintiff seed cane to plant twenty acres, forty acres thereof being already in stubble.

That, under said contract, plaintiff was to pay respondent, in addition to said $3.00 per acre for each acre of stubble cane, and, also, each acre so planted with seed cane, thus making a total of $635.00 to be paid him by the plaintiff.

· Defendant further represents, that under said contract, plaintiff was to procure the necessary laborers, and diligently cultivate all of said land so rented to him, and during the grinding season was to cut, haul and deliver all the cane so produced on said land to the respondent at his gin house on the Grand Bay plantation, and respondent was to pay to said plaintiff the sum of $2.25 for each ton of cane so delivered.

He shows further, that after said contract was entered into, it was discovered that the plaintiff was totally unable to carry out his part of the contract, and to properly cultivate the crop of cane on said rented land; and, that respondent was, therefore, compelled to advance to the plaintiff not only the household expenses, but, also, the necessary advances to enable him to cultivate and make said crop.

That the plaintiff was unable with his own means and teams to cut, haul and deliver said crop of cane as agreed, and respondent was obliged to use his own teams and means to have the said cane cut, hauled and delivered, and that the expenses thus incurred for advances and furnishings in cash, supplies, and the use of teams and wagons, amounted to the sum of $2,077.89, as will be shown by reference to the detailed account annexed thereto, for which sum the plaintiff is indebted to him.

That said sum for advances, added to the $635.00 due for rent and seed and stubble cane, makes a total amount due by plaintiff to him of $2,712.89; and for said sum respondent has a lien and privilege on all the cane produced on said land, and on all the sugar and molasses produced from same.

Respondent further avers, that the cutting and hauling of said cane

had not been completed either at the time of the filing of the plaintiff's original petition or of his supplemental petition; and that said suit was premature, and that the writs of sequestration issued without just cause, and that he has been damaged to the extent set forth in his motion to dissolve the writs of sequestration.

Wherefore, he prays, that the plaintiff's demand be rejected with costs, and that there be judgment in his favor to the amount of damages claimed.

I.

The first question to be disposed of is the defendant's motion to dissolve the writs of sequestration, the charge of which is, that the defendant's affidavits are untrue, and that the writs issues without good reason or legal or just cause.

The affidavits are that all the facts and allegations of the petition are true; and the averments are, that the plaintiff "fears that Robert- "son will conceal, part with or dispose of the sugar, syrup and mo- "lasses, · * * * during the pendency of the suit."

The following is a summary of the evidence *pro* and *con* on the issue thus joined.

The plaintiff made this statement, viz:

"What led me to get a sequestration in this suit is that I owed Mr. " Grand Decuir $100, and I gave him a draft for same on Mr. Robert- "son, and Mr. Robertson refused to pay it. Mr. Decuir came back in " the field with the draft, and he told me about it in the presence of " Villarubia Decuir. Then, I went over and saw Mr. Robertson why " he did not pay that draft. He answered me that he was not any " bank for me to draw on him, and he did not know whether he owed " me or not.

"At the time he told me so, we had not finished with the 1051 tons " cane, but there was something in that neighborhood, already deliv- "ered. Then I asked Mr. Robertson for a settlement, and that we · " would find out whether he owed me or not. He told me he had no · " time to settle. That was about the 20th of December. The delivery " of 1051 tons of cane began in November. By my contract with Mr. " Robertson, he was to settle with me, as stated in document A, the " clause I refer to in the document is the clause 4th. During the " same week, I saw Mr. Robertson again about a settlement, and he " said he had no time and was too busy. About two weeks after, I

" went with my father to see Mr. Robertson about a settlement. He " told me he did not have time, in the first place, and he would wait " until he settled with his merchants, and then after that he would " settle with me, if he had any money coming from the merchant. I " told him I thought I had the first privilege of being paid. He said, " 'Well, you think so, but it's not so.' I asked him would he be willing " to give me security for my crop, and then I would be willing to wait " on him for the time specified for, then, I would be secured. He did " not want to give me any security. He said that he did not have to " give me more security than I would him. So then, I came to see " Mr. Provosty, and asked him what I should do in the case.

"Mr. Robertson was shipping sugar every day to New Orleans, and " it looked like he was going to ship all and I would not have any- " thing there to secure me, and then I got uneasy, not knowing Mr. " Robertson's financial standing. From the way Hypolite Bouligny " spoke to me, he was uneasy. Bouligny was a tenant on Nina planta- " tion, like myself. He did not see how he could have any claim o- " any guarantee for what was coming to him, if anything was due him " at the time. I mean, if Mr. Robertson owed him."

"Q.—You have testified that you were uneasy with regard to the " security of your claim against defendant. Now, please state " whether Bouligny entertained any apprehension in the same connec- " tion, with regard to his claim, and, if so, how did you know it?

"Objection.—It is objected to on the ground that witness can not " testify as to the state of mind of a third party. The court overrules " the objection. To this ruling defendant excepts, and reserves a bill " of exceptions.

"I know, from conversation with Mr. Bouligny, that he was afraid " that defendant would ship all the sugar and that he would not have " anything there to get a settlement from, as Mr. Robertson was ship- " ping sugar all the time as he made it. No one else spoke to me " about it."

Pages 18 and 19 of printed record.

Edward Vives, Sr., for plaintiff, sworn, says:

"I am the father of the plaintiff in this suit. I went to see Mr. " Robertson about a settlement of this matter for my son. On the " last day of the year I was present at a conversation between my son " and Mr. Robertson. My son asked him for a settlement. Mr. Rob- " ertson answered, 'I will not make a settlement before I get through

" grinding, and moreover, I will not settle with you before I settle with
" my merchant, for I consider my merchant the privileged creditor.
" If there is any more over, I'll pay you.'

"I told him I didn't think he had a right to take the money of my
" son to pay his merchant.    Then he said 'I think otherwise.'    My son
" told him, 'I drew a draft on you for $100 and you refused to pay it.'
" He said that he was no banker, that he didn't know that he owed my
" son anything, or that my son owed him.    Then I told him, 'Why
" don't you settle?' and he said, 'Well, I have no time.'    My son told
" him, 'I'll have to proceed according to law.'   · He said 'Go ahead and
" proceed; if you've got any money to spend, I've got some, too.   I am
" able to spend $100, $300, $30,000.'    Then, seeing that, I told my son
." we had better go and see a lawyer.    We came to New Roads and em-
" ployed Mr. Provosty as a lawyer."

Pages 27 and 28 of printed record.

The party referred to by the plaintiff in the course of his testimony,
Hypolite Bouligny, was introduced as a witness in his behalf, and, in
the course of his interrogation, the following occurred, viz:

"Q.—During the grinding season of 1897-98, were you uneasy about
" getting your pay for your cane, and that you might lose your claim?
"A.—No."    Transcript, page 39.

This witness stated, that he was a tenant of the defendant Robert-
son during the year 1897, under a verbal contract similar to that of the
plaintiff.

Edward Vives, Sr., made the further statement that, when he went
in company with his son to see Mr. Robertson, it was the last day of
the year 1897, and his "son had already left the place."

Transcript, page 42.

The foregoing is, substantially, all of plaintiff's testimony with re-
gard to the facts upon which he sued out the writs of sequestration.

Per contra Mr. J. V. Decuir, manager of the defendant's Nina plan-
tation, says:

"I didn't see anything that would induce anyone to apprehend, or
" fear, that Mr. Robertson was going to make way with the crop of
" sugar.   At the time of this seizure, there were several hundred bar-
" rels of sugar in the cooper shop.    I didn't know how much sugar
" there was in the hot room, but there was always plenty of it there.
" The grinding ended on the 20th of January.

"I receive salary as manager on the place.   .I got my final settle-

"ment in May. I didn't have any apprehension; I wouldn't have "waited that long if I had. My salary is $100 a month."

Page 33 of the printed record.

Again:

"*The barrels of sugar were stored in the cooper shop, I think, in the* "*latter part of December, and remained there until the latter part of* "*January.* It was about the latter part of December that it was "stored there. I couldn't say whether the shipping was going on reg- "ularly on the plantation. I do not think they shipped any while it "was being stored in the cooper shop."

Page 34 of the printed record.

The statement of the deputy sheriff, Joseph Dessommes, who made the two seizures under the writs of sequestration, is as follows, viz:

"I am a deputy sheriff of this parish. I am the officer who made "the two sequestrations in this case. When I made the two sequestra- "tions, there was a large quantity of sugar in the cooper shop. The "size of that shop is about 100 feet long, by 30 or 40 wide. The whole "floor of the building was covered with barrels of sugar, two tiers "high. I don't know that the second tier was entirely complete. "There was a lot in the sugarhouse, in barrels. I can not say how "much there was. There was a lot of loose sugar that they were "barreling. The sugarhouse was in full operation at the time.

"When I went to make the second sequestration, I found about the "same sugar. I did not go in the sugarhouse the second time; I "seized sugar in the cooper shop. I seized sugar, the first time, in "the cooper shop, but I went in the sugarhouse. When I went there "the second time, everything was moving; the sugarhouse was in full "operation."

Pages 35 and 36 of the printed record.

The statement of F. O. Lieux is, that he is the owner of the Grand Bay plantation which he leased to the defendant in 1897, and is acquainted with both of the parties to this suit.

That "Mr. Robertson had about between thirty-five and forty mules "on Nina at the time of this siezure. He had seven or eight wagons "on Nina. Nina was well stocked with agricultural implements, etc., "plenty of corn, forage, and everything of that kind. Nina was well "supplied with seed cane at that time. It was well supplied with one "year stubble. In fact, there was enough seed cane to plant about

" 300 acres, more or less. Nina plantation at the time of the seizure,
" with all those things on it, was worth about $25,000.

"The Grand Bay sugarhouse was lighted ·by electricity, the plant
" belonging to Mr. Robertson. I think he paid bewteen · $900 and
" $1,000 for it. He put it up last year, in the summer. At the time
" this suit was brought, all of these improvements, buildings, mules,
" and cattle, on Grand Bay, about which I have testified, belonged to
" Mr. Robertson individually. . At the time this sequestration was
" made, I had no knowledge of any financial embarrassment on the
" part of Mr. Robertson, whatever. I was still living on the place at
" the time, and am living there still. When I rented out my planta-
" tion, I reserved two houses and my yard, with all appurtenances.

"The affairs of the plantation and of the sugarhouse, at the time of
" the sequestration, were being conducted in the usual manner, in a
" business like way.

"Prior to this sequestration, Mr. Robertson made no shipment of
" sugar or molasses otherwise than in the usual business way. If he
" had done so, I would have been apt to have known it."

Pages 38 and 39 of printed record.

Again:

"The capacity of the Grand Bay mills is about 200 tons of cane,
"about 25,000 pounds of sugar. When I say 25,000 pounds, it is pretty
" large. Mr. Robertson pays $2,000 net, he pays all expenses. The
" taxes are between $290 and $300. Apart from the Nina plantation,
" Mr. Robertson had, at the time of the seizure, other property liable
" to seizure, viz: he had ten mules on Grand Bay, four horses, and
" eight or nine cows, some of them with calves; about thirty hogs,
" about five or six sheep, and the railroad from the sugarhouse to the
" river, which is about three-quarters of a mile long, with rolling
" stock, and railroad from my sugarhouse to Nina, a mile and three-
" quarters long, with six conveyors which cost him, I think, from $150
" to $200 apiece."

Page 37 of printed record.

The following is the statement of the defendant as a witness in his
own favor, viz:

"Up to the time of the two sequestrations in the case, I had done
" nothing with any portion of my crop and property in such·a way as
" to ·induce any one to believe that I would conceal, or part with the
" same or part thereof, in such a manner or with the intent to place it

" beyond the reach of my creditors, or to deprive anyone of his claim
" against me on said property. The total amount of sugar manufac-
" tured by me during that season was one million and a half pounds.
" I was not, at the time of the issuance of either of the sequestrations
" in this case, nor had I been prior to those dates, shipping or dispos-
" ing of any of my sugar and molasses outside of the usual course of
" business. I was not doing much shipping prior to these sequestra-
" tions. I have the bills of lading of sugar shipped by me. Com-
" mencing with the 17th of December, my shipments were as follows:
" 84 bbls. of sugar. This shipment comprised lots 4, 5 and 6. Dec.
" 18th, lots 4 and 5 again, 45 barrels. Dec. 24th, lot 10, 100 barrels of
" second sugar. Dec. 27th, 21 barrels; on the 29th, 72 barrels of su-
" gar, lots 4, 5, 54 and 55. Dec. 30th, 101 barrels, lots 11, 55 and 56
" Jan. 2nd, lot 11, 69 barrels; lot 54, 21 barrels. Jan. 5th, lots 59, 60
" and 61, 100 barrels. Jan. 10th, lots 12 and 13, 39 barrels and 54 bar-
" rels of molasses. Jan. 23rd, Jan. 17th, 44 barrels molasses. Jan.
" 23rd, 241 barrels sugar, lot 12, 14, 61, 62, 67, 70, 73 and 75, and 61
" barrels of molasses. Jan. 26th, 296 barrels sugar, lots 12, 56, 61, 62,
" 63, 64, 66, 67, 71, 72, and 107 barrels molasses. Jan. 26th, lot 12, 9
" barrels; lot 64, 4 barrels. Jan. 29th, 167 barrels of sugar, lots 12,
" 62, 64, 66, 67, 70, 71, 72, 73, and 70 barrels molasses. This comprises
" the sugar in barrels, exclusive of $2,000 worth of sugar in cars in
" the hot room, which I could not ship.

"At the time the sequestrations were made in this case, I owned the
" Nina plantation and everything on it, comprising forty odd head of
" mules, complete stock of agricultural implements, seed cane wind-
" rowed 100 acres, more or less, all the stubble on the place, store build-
" ing, twenty-four cabins, one fine dwelling house, a large barn full of
" corn and hay; also, 7 wagon gears and everything complete. I own
" ten mules on the Grand Bay plantation, which I had paid for; 1¾
" miles of railway, with rolling stock for same, used for the purpose of
" conveying cane, which cost me over $3,000; and for which I paid en-
" tirely, and also ¾ of a mile of railroad running from Grand Bay
" sugarhouse to the river, used for freight, for which I paid $1500, and
" was entirely paid for. Also one dwelling house, exclusive of the
" aisle, which cost about $400, one other dwelling house which cost me
" $100, one scalehouse and scale complete, which cost me about $400;
" one blacksmith house complete, which cost me about $200; one elec-
" tric plant, new, complete, which cost me $100; two Baldwin sugar

" shakers which cost me $150; fifty sugar cars, which cost me $600;
" several pumps valued at about $200; one upright engine, new, about
" $100—all of which were paid for at the time of this seizure. · Besides
" this enumeration, I had other values in property, such as having or
" had constructed, an entirely new mill and which cost me $1,000, and
" for which I had paid for. I had about $5,000 or $6,000 at my mer-
" chants, as near as I can recollect. I also had, at the time of the first
" seizure, and, also, at the second seizure, 600 barrels of sugar in the
" cooper shop, 200 and odd barrels in the sugarhouse, also about ·300
" barrels, estimated, in the hot room in the cars; also about 300·bar-
" rels of molasses on hand in barrels. This sugar amounted to $15,000
" at least.

"At that time, the Nina plantation, with what was on it, was worth
" $30,000. I wouldn't have taken less than that for it. I did not tell
" Mr. Vives that I would settle with my merchant before I settled with
" him, and after settling with my merchant, would settle with him if I
" had any money coming from my merchant. I did not tell him any-
" thing like that. I did not tell him that my merchant had the first
" privilege. The first time, I simply told him that he knew perfectly
" well that I was working 18 or 19 hours a day, that I was doing all of
" my own clerical work, and really did not have the time to do any
" kind of work that could be put off at a further day. He knew per-
" fectly well that he was not out one five-cent piece; that he had canes,
" too, in the field, that I had been compelled to harvest his crop to save
" the money that I had already spent on it; that I was buying canes of
" several other parties outside of the plantation to whom I had not ad-
" vanced a cent during the whole year.

"These gentlemen never worried me for a settlement, and waited
" upon my time, and I certainly thought that he could do likewise, and
" that just as soon as I was possibly able, I would make up his account
" up to date, and then add to it the proceeds of the balance of his cane,
" which was still out in the field, and whatever was coming to him, he
" would most positively get immediately. This did not seem to suit
" him, however. He went away and then consulted Mr. Provosty, who
" called upon me in person, by himself. He requested to know why we
" could not come to an understanding or would not give Mr. Vives his
" account. I told him what I had told Mr. Vives, and he couldn't see
" why I couldn't do it. He failed to see why I could not make out
" that statement, and he requested me to try and make it up for him.'

" I told him I would try and do so, and he said, 'When?' This was on, " I think, about a Monday; I said about Thursday or Friday. All this "conversation took place at the Marionneaux store. The latter part of " the week, he came to the sugarhouse accompanied by the two Vives, " the elder and junior.

"He inquired of me whether I had made out the account as request- " ed. I told him I had not finished it, but I had started on it, and " hoped to have it ready the following day. He said that he would " come for it himself. Instead of doing so, he wrote me a letter that " having been called away on some business, I think to Baton Rouge, " to please mail the statement to him at New Roads, and that state- " ment, showing exactly how I stood with Mr. Vives, errors and omis- " sions excepted, in the ordinary course of account, was duly sent to " Mr. Provosty the next day, and was in the New Roads postoffice the "night before the first seizure. He acknowledged the receipt of my " account, under date of Jan. 13th, 1898, and this account is now of- " fered in evidence and marked B. See p. — of transcript.

"Of course, I was seized and had to go to New Roads to bond the " same out. I had to employ a lawyer immediately, as I did not know " how this was going to affect me, as it caused immediately a good deal " of comment and gossip among my creditors. Having bonded out " same, I resumed my vocation and completed hauling of the balance " of the canes in the field, when I was sequestered again. I had to " leave my business again, come to New Roads, employ counsel, and fix " another bond."

Pages 43, 44, 45, 46 and 47 of the printed record.

The following is the statement of Hon. O. O. Provosty, counsel for the plaintiff, viz:

"Cross-examination:

"My impression is, that I made my first visit to Mr. Robertson be- " fore the suit. It was five or six days before the suit that I made my " first visit. It was at the Marionneaux store that I saw Mr. Robert- " son. I think it was on that occasion that I visited the sugarhouse, " which was then in operation. Matters seemed to be going on there, " in the sugarhouse, just the same as they would be in any sugar- " house of the same kind in the grinding. The date of my second " visit was a few days after I had made my first visit, and then, of " course, just before the seizure. This is my impression. The sugar- " house was in operation then. There was a good deal of sugar there.

"I could not see any haste or excitement anywhere. So far as I could " see, everything was moving smoothly. The contention between Mr. " Vives and Mr. Robertson was that, Mr. Robertson contended, that he " was not liable to Vives for more than $2.25, and, also, complained " that he had to carry Mr. Vives, and had to do more for him than he " agreed to do. The eleven acres of cane were not then ground. Mr. " Robertson did not refuse to make a settlement; he said he was very " busy and did not have time to make a settlement."

Page 30 of printed record.

In our opinion, the foregoing testimony clearly shows, that the plaintiff's alleged fear, that the defendant would conceal, part with, or dispose of his sugar and molasses during the pendency of the suit, was not well grounded, and that the writs of sequestration were incorrectly obtained.

He affirms it to have been a fact, that the cause of his taking out the writ of sequestration was, that the defendant declined to pay his draft for $100.00 in favor of Grand Decuir; but he further states that when he called upon the defendant to learn his reason for declining to pay the draft, he replied that he had not finished grinding his sugar, and did not know whether he owed him anything or not. That, thereupon, he demanded a settlement, and his reply was that he did not have time to settle with him.

"That," the plaintiff as a witness, says, "was about the 30th of December, 1897;" and, at that time the plaintiff had not completed the harvesting of his cane, nor completed his delivery thereof.

The proof and pleadings abundantly show, that the plaintiff was renting land from the defendant for that year, and that defendant had furnished the plaintiff his plantation and family supplies, and, consequently, there were obviously mutual accounts between the parties at the time.

The proof further shows, that there was a difference between the parties as to the price defendant was to pay the plaintiff for his cane.

The plaintiff sought to justify his alleged apprehension of defendant's disposition of his sugar, by quoting the statement of another tenant on the Nina plantation, to the effect that he was "afraid that de- " fendant would ship all the sugar, and that he would not have any- " thing to get a settlement *from,* as Mr. Robertson was shipping sugar " all the time as he made it"; but, when the plaintiff placed him on the

stand as his own witness, and propounded to him that direct question, his prompt response was, "No."

And plaintiff frankly admitted, that no one else had spoken to him on the subject.

The proof shows, that at the time of the seizure, there were several hundred barrels of sugar "in the cooper shop," and a considerable number "in the hot room." That they were deposited there in the month of December, and remained there until the latter part of January. That state of facts is affirmed by more than one witness, and it is verified by the deputy sheriff who made the seizure.

The defendant as a witness, and two others, testify, that there had been shipped by defendant, only small amounts of sugar, and, as was customary with him in the usual course of his business.

Defendant states that it will appear from his bills of lading, that during the month of December, and up to the date of the seizure under the first writ of sequestration in January, 1898, there had been shipped only 680 barrels of sugar.

But, the proof is abundant to the effect that the defendant owned one plantation well stocked in every respect and worth $25,000; and a large quantity of other property in addition.

That the Nina plantation contained nine hundred acres, all of which was in cultivation, and that the plaintiff only rented ninety-five thereof.

That, in addition, the defendant operated the Grand Bay plantation under a five year lease, and had it very well stocked and equipped for the cultivation of cane and manufacture of sugar.

That among its equipments was, an electric light plant in full operation, and a tram, or railway extending from Grand Bay plantation to the Mississippi river, a distance of one and three-quarters of a mile, with a complete supply of rolling stock, etc.

The plaintiff's petition and affidavit for the issuance of the writs of sequestration are formal and fully comply with the requirements of the code, but, the defendant denies the reasonableness of the fear he expressed; and not only has the defendant proven the groundlessness of that fear, but the plaintiff himself as a witness puts his action upon an altogether different ground.

The recent decisions of this court, are to the general effect that it was sufficient for the plaintiff to allege and swear (1) that the debt claimed was due and owing; (2) that he had a privilege on the prop-

erty described, and (3) that he "fears that the defendant will conceal, " part with, or dispose of the same during the pendency of the suit."

Lowden vs. Robertson, 40 Ann., 825.

Goldman vs. Goldman & Masur, 47 Ann., 1463.

Hewitt vs. Williams, 47 Ann., 747.

That postulate rests upon the textual provisions of the Code of Practice 275, No. 8; but it only extends to the sufficiency of the plaintiff's averment and oath, and not to the truthfulness thereof.

For, notwithstanding the court said in Lowden vs. Robertson, that " the plaintiff is not required to swear that he has *good reasons* to fear, " but simply that he fears (C. P., 275, No. 8), yet the court recog- " nized defendant's right to move to dissolve the writ on the ground " that the plaintiff's affidavit is untrue, though it would be certainly " difficult to establish that such an allegation is untrue."

The opinion in Lowden vs. Robertson is based exclusively upon Wells vs. St. Dizier, 9th Ann., 119; but the motion to dissolve the sequestration was based upon "errors apparent upon the face of the record."

Mabry vs. Tally, 15th Ann., 62, rests upon the same ground; and, likewise, Blanc vs. Wallace, 26 Ann., 492.

In Milling Co. vs. Lawler, 39 Ann., 572, the defendant filed a motion to dissolve a sequestration on the ground that the oath of the plaintiff was untrue, and that the acceptances sued on were not due and the suit premature; in the district court the writ was dissolved, and by this court, that judgment was affirmed.

The same conditions were presented in Egan vs. Fush, 46th Ann., 474, wherein all the authorities are collated.

But in American Furniture Co. vs. Grant-Jung Furniture Co., 24 Southern Reporter, 182, the question herein considered was expressly decided by this court, on the lines herein laid down.

We take it to be the undoubted sense of all the authorities that a sequestration must be dissolved, if the proof administered discloses that in point of fact, the oath of the plaintiff is untrue. In our judgment, the testimony fails to sustain plaintiff's fear, and the writs must be dissolved.

The following is the account which is annexed to the defendant's answer, viz:

Vives, Jr., vs. Robertson.

"A. V. ROBERTSON,

Cr.—                                E. VIVES, JR.

By 1186 39-2000 tons cane, at $2.25...................... $2668 90

32 61-100 acres stubble, at $5...........................  163 50

Seed cane to plant, 15 acres, at $5........................   75 00

                                                          _____

Dr.—                                                      $2907 40

(1)   To cash for cultivating crop................ $425 19

(2)   To cash for cutting, loading, etc............  889 50

(3)   Interest on $425.19........................   17 95

(4)   2½ *per cent.* commission for advances......   10 62

(5)   2 cords wood ...........................    3 25

(6)   3 moss collars ...........................    3 25

(7)   5 mules one-half day cultivating ..........    2 75

(8)   1 2-mule cart, cultivating, 1½ days.........    1 50

(9)   Blacksmith work ........................   13 65

(10)  Hauling and planting, 9 teams.............   33 45

(11)  15 bushels peas at $1.75..................   26 25

(12)  4 hoes and handles, at 75c................    3 00

(13)  30 sacks oats, 150 bu., at $1.75 sack..........   52 50

(14)  Windrowing seed cane ...................   62 50

(15)  30 61-100 acres plant cane, at $5..........  162 50

(16)  40 12-100 first year stubble, at $5..........  200 60

(17)  30 61-100 acres fall plowing, at $4........  130 44

(18)  Rent of 58 3-mule carts, at $3.50...........  203 00

(19)  Rent of 17 4-mule wagons, at $4...........   63 00

(20)  22 91-100 acres corn land, at $4............   91 60

(21)  72 73-100 acres cane land, at $2...........  218 19

(22)  Family supplies from store and cash........  123 20—$2742 89

                                                          _____

        To your Cr.................................... $164 51"

The following is an extract from the brief (p. 3) of plaintiff's counsel which is self-explanatory, viz:·

"For convenience we will, in discussing the items of difference be-
" tween plaintiff and defendant, adopt the order in which these items
" are found in this account filed by defendant.

"But, first, we will eliminate those as to which there is no contest.
" They are:

"On the *credit* side:

"Thirty-two and sixty-one one-hundredths acres stubble at $5.$169 50
"Seed cane to plant fifteen acres, at $5......................  75 00

"And to the *debit* side:

"Cash for cultivating crop ...............................$425 19
"Interest on $425.19 ...................................  17 95
"Three moss collars ...................................   2 25
"Five mules, one-half day cultivating.....................   2 75
"One 3-mule cart, one and one-half days...................   1 50
"Blacksmith work .....................................  13 65
"Hauling and planting, nine teams ......................  33 45
"Fifteen bushels of peas at $1.75 .......................  26 25
"Four hoes and handles, at 75c...........................   3 00
"Thirty sacks oats ...................................  52 50
"Thirty and sixty-one one-hundredths acres plant cane, at $5.  163 50
"Forty and twelve one-hundredths acres first year stubble at $5  200 60
"Rent for seventy-two and seventy-three one-hundredths acres

   cane land, at $3 ..................................  216 19
"Family supplies from store and cash....................  123 20

There is no contest as to the following additional items:

"Windrowing seed cane, $62.50." Of this item, defendant says in his testimony (p. 60): "This is a clerical error made by me. It should " have been $12."

"Rent of 22 90-100 acres corn land at $4, $91.60. By the contract " the land was rented at $3, so alleged in both the petition and the " answer. The charge of $4 here made instead of $3 was admitted in " the lower court to have been made in error, and that it should have " been $3."

It thus appears, that on the *credit side* of defendant's account, two out of the three items are admitted by the plaintiff's counsel to be correct, and, consequently, there remains for examination the single item of amount defendant is due plaintiff *for the purchase price* of cane—whether more than $2,668.90, as admitted.

Of the items on the *debit* side of the defendant's account, the following are admitted, viz:

Numbers 1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 21 and 22.

The remaining *debit* items which are contested are the following, viz:

"No.  2—To cash for cutting, loading, etc................$880 50
"No.  4—To 2½ *per cent.* commission for advances.......... 10 62
"No.  5—2 cords of wood ............................. 3 25
"No. 14—Windrowing seed cane ........................ 62 50
"No. 17—30 60-100 (acres) fall plowing at $4.00............ 130 44
"No. 18—Rent of 58 3-mule carts at $3.50................. 203 00
"No. 19—Rent of 17 4-mule wagons at $4.00............... 68 00
"No. 20—22 91-100 acres of corn land at $2.00............∴ 218 19

These aggregate the sum of.............................$1585 00
As against amounts admitted aggregating................. 1157 89

Deducting the latter sum from that admitted to be due, there appears to be only about fifteen hundred dollars in controversy.

The two items for which credit is given plaintiff on the defendant's account, aggregating $238.50, being *admitted,* there remains but one item of credit which is open to discussion, and that is the following, viz:

"By 1186 39-2000 tons of cane at $2.25................$2668 90"

Plaintiff's claim in his original petition is, that he had already delivered to the defendant one thousand and fifty-one tons of cane for which he was entitled under his contract to receive three dollars per ton, or, the aggregate sum of $3,153.00; and that there were in the field at the time of filing suit, about eleven acres of cane already cut but not delivered, the estimated weight of which was two hundred and fifty tons, worth $750.00.

In his supplemental petition his averment is, that this cane had been actually delivered, and weighed three hundred tons, and was worth $900.00—the whole of the cane aggregating in value $4,053.00.

From this statement it appears that plaintiff claims for one hundred and sixty-five tons of cane more than defendant concedes; and insists that the defendant contracted to pay three dollars per ton, while he asserts that he only agreed to pay $2.25 per ton.

Plaintiff as a witness states, that defendant made an agreement to " pay not less than $2.25 per ton for cane  *  *  *  and if the price " would justify it, he would pay more, or as much as he could."

He then makes reference to the *projet* of a contract unsigned, which contained a statement of the price *proposed* in terms, somewhat like that of the plaintiff.

This memorandum, he claims, was furnished him by the defendant,

and he relies upon it as a circumstance tending to corroborate his recollection of the parol agreement.

The plaintiff's father says that, subsequently, in a conversation with the defendant, he asked him how much he was to pay his son, and he said $2.25.

He then remarked to the defendant that he had understood that under the contract he was to "pay $2.25, or as much as he would pay to any other", and he said "No; I said I would pay as much as I could." But this witness made no reference to the memorandum of which the plaintiff spoke.

Another witness testifies, that he had a conversation with the defendant, and that he made a statement somewhat similar to that mentioned by the previous witness.

The statement of some of the witnesses, is that they sold cane to the defendant in 1897 for $3.00 per ton; and that of some others was that they sold at $2.25.

The statement of the defendant is, that "the price for cane deliv-
" ered at the Grand Bay sugarhouse was thoroughly understood, with-
" out a prticle of difference to be $2.25 a ton.   This was the final price
" as understood in this verbal agreement.   This practically terminated
" any agreement that we had, or ever did have, concerning the price or
" the conditions."

He positively affirms, that the words in the *projet* or memorandum of agreement, viz: "Not less than," before the figures "$2.25". were not written by him; and no witness was produced who denied his positive assertion in that respect.

Mr. F. O. Lieux, the owner of Grand Bay plantation, which defendant had under lease at the time, testified as follows, viz:

"I was present when Mr. Robertson and Mr. Vives had an agree-
" ment about the rent of land.   That agreement was that Mr. Vives
" was to rent so many acres of land   *   *   *   *   *

"He was to cultivate that in cane, or corn, and for his compensation
" he was to receive $2.25 for all the cane he would deliver at the su-
" garhouse."

In the course of the cross-examination of the plaintiff he said the contract was made with the defendant at Grand Bay sugarhouse in the presence of Mr. Ovide Lieux and Howard Breaux; but from the foregoing testimony of Mr. Lieux, it appears that he disagreed with

the plaintiff and affirms the correctness of the testimony of the defendant.

Our conclusion is, that the preponderance and weight of the testimony establishes the contract price of cane per ton to have been $2.25.

With regard to the quantity of cane which the plaintiff delivered, he makes this statement, viz:

"At the time of filing this suit, there had been delivered and manu-
" factured 1051 tons of cane.  I got these weights from Mr. Sarrazin,
" the cane weigher.  Mr. Sarrazin was Mr. Robertson's cane weigher.
" I made a memorandum of this tonnage."

Page 16 of the printed record.

In the course of the examination of the defendant as a witness, the following occurred with regard to the tonnage of the cane, viz:

"On the credit side of the account, item No. 1, 1186 tons and 39
"pounds of sugar cane at $2.25, total $2668.90, represents the total
" amount of all said Vives' crop delivered at Grand Bay scales and
" sugarhouse, as presented to me by my cane weigher and for which—

"Plaintiff objects to the testimony of the witness as it purports to
" be founded on statements made to him by his weigher, on the ground
" that it is hearsay evidence, and that the books of the party can not be
" admitted in evidence in his own behalf.

"By the Court:  .

"I regard the weigher as acting for both the producer and the man-
" ufacturer, and, as plaintiff has predicated his statements of 1051
" tons of cane on the representations of the weigher, I think the privi-
" lege should be accorded to the defendant.

"To this ruling plaintiff excepts and reserves and makes this his bill
" of exceptions.

"I got these weights from the same weigher who weighed all the
" cane that was brought to the Grand Bay sugarhouse.  Items Nos. 2
" and 3 are not disputed."

Page 142 of printed record.

In our examination of the breif of the plaintiff's counsel, we have found no reference to the foregoing ruling of the court; and inasmuch as both parties resorted to the same source of information, with regard to the tonnage of the cane, the court is disposed to take the statement as correct.

The only argument opposed to it is founded on analogy, and it refers exclusively to the part of the crop that was produced upon the

eleven acres which were undelivered at the date suit was filed; but it is fully met and overcome by the actual weights of the sugar-weigher.

Had either been dissatisfied with that evidence, the books and records of the manufacturer, and the testimony of the sugar-weigher were easily accessible to both litigants.

Having reached this conclusion, we find that the true credit in favor of the plaintiff is given in the defendant's account at $2,907.40; and the only matter remaining open for decision is, the amount of debt there is legally chargeable against him.

## III.

The items of defendant's charges which plaintiff admits to be correct, aggregating $1157.89, there remains for examination contested items aggregating $1585.00.

· (a.) The disputed charge is that of "cash for cutting, loading, etc., "$889.50."

The statement of the plaintiff with regard to this item, is as follows, viz:

"The item, cutting, loading, etc., $889.50, is not correct, because " Mr. Robertson and I made a contract for taking off my crop for " fifty cents a ton and I was to furnish him my mules to work them " on the place, he to feed them during the time he needed them. He " made this contract in April or May. Mr. Robertson sent for me. I " went to his house, and he told me that he wanted me to furnish him " security for the feed bill. I told him I did not have any security. " He said, 'I have to pull through this year, but I'll not do it another " year.' Then he asked me how much I could take the crop off for. " I answered him that I could for fifty or fifty-five cents a ton. He " told me he would take it off for fifty cents if I would furnish him my " mules so that he could work them on the place. I told him I would, " if he would feed them during the time he would use them. Mr. " Robertson did take off my crop. There was no question at any time " of his not doing so. He worked my eight mules from the begin- " ning of grinding until the end. By taking off a crop, it meant cut- " ting, hauling and delivering cane to the mills. Taking the cane " standing and delivering to the mills, and doing anything that is ne- " cessary to do, including windrowing, in case windrowing is neces- " sary."

Page 20 of printed record.

The purport of this testimony is, (1) that plaintiff made a contract with the defendant to take off his (plaintiff's) crop, (2) that plaintiff was to furnish his eight mules to assist in performing the work, and defendant was to feed them, (3) and defendant was to receive fifty cents per ton for taking off the crop.

That "taking off the crop meant cutting, hauling and delivering cane at the mill; and windrowing the cane if necessary."

On cross-examination plaintiff says the cane on the eleven acres in question was part of the land he leased on Nina plantation, and the cane was delivered after the filing of this suit; and that same was hauled to the sugarhouse by the defendant, and by *his* team.

Another witness makes the statement that "Mr. Robertson did not " deny having made a contract to take off the crop (of plaintiff) at " fifty cents per ton; but he explained very fully why the settlement " could not be made on that basis, the substance being that Vives had " not kept his part of the contract, or something of the kind."

That statement does not, in our opinion, strengthen the plaintiff's declaration; on the contrary it rather militates against it.

The testimony of the defendant is as follows, viz:

"The second item, cash paid for cutting, loading, etc., $889.50. " This amount was what I actually paid out for labor only for moving " the said Vives' crop to the sugarhouse as enumerated."

Page 41 of printed record.

He states further that plaintiff knew perfectly well "that he had " cane in the field that (witness) had been compelled to harvest (in " order) to save the money (he) had already spent on it." etc.

Record, p. 45. Page 67 of Record.

His evidence on this question is concluded as follows, viz:

"I positively deny having ever entered into such a contract, or even " spoken of it, as testified to by Mr. Vives, that, to handle his crop; to " cut, load and haul same; pay the laborers and furnish the teams. " The closest distance that his crop had to be hauled was about six or " seven acres, and the farthest about a mile and a half. That nearest " cane, there was about 15 acres of it, and that is the cane which he " calculated cost him about $1 to haul per ton." Page 69 of Record.

Page 47 of printed record.

Consequently, the plaintiff having affirmed the existence of a contract with the defendant to bear off the crop at fifty cents per ton, and the defendant having positively denied it, the matter is set at large;

and the failure of the defendant to disavow it to a third person does not carry the preponderance of proof to the plaintiff, in the face of his contemporaneous assertion that any settlement on that basis was impossible.

We feel bound to affirm that the alleged contract is not established; and, as the assertion of the defendant is positive, that he actually expended the sum of $889.50 in cash as charged in his account, we are equally bound to allow it as a proper charge against the plaintiff.

(b)   Item 4, "2½ *per cent.* commission for advances, $10.62," is sworn by the defendant to be correct, and the plaintiff makes no denial. It must, therefore, be allowed.

(c)   Item 5, "2 cords of wood, $3.25," must be reduced to $1.00 per cord, the plaintiff acknowledging that value, and not denying the amount. We therefore place that item at $2.00.

(d)   Item 14, "Windrowing seed cane, $62.50" should be reduced to $12.00, inasmuch as the defendant admits in his evidence that the charge of $62.50 was a clerical error. Transcript, p. 60.

(e)   Item 17, "30 61-100 fall plowing, $130.44," is denied *in toto* by the plaintiff on the ground that same was not made mention of by the defendant as a part of their contract; its correctness is affirmed by the defendant. It must be rejected and *disallowed* for the reason, that it should have been fully explained and made certain by the defendant.

(f)   Item 18, "Rent of 58 3-mule carts at $3.50, $203.00," is denied by the plaintiff on the ground that same was included in the charge for bearing off the crop by the defendant; and the defendant admits that "this is the price he charged the plaintiff for loan or use of his " wagons and carts and teams in removing his crop of cane to Grand " Bay sugarhouse." We think it clear that this item is an erroneous charge and should be *disallowed*.

(g)   Item 19, "Rent of 17 4-mule wagons at $4, $68.00," is in exactly the same situation and for a like reason must be *rejected and disallowed*.

(h)   Item 20, "22 91-100 acres of cane land at $4, $91.60," should be reduced to $3 per acre, and should be reduced on the averments of defendant's answer, fixing the price per acre at $3.00.

Summarizing the foregoing conclusions and deductions, we find that the defendant's credits should be reduced by the sum of $470.29; and as thus reduced his total credits aggregate the sum of twenty-two

hundred and seventy-two and 90-100 dollars, and deducting that sum from his total debits, we find the balance due the plaintiff to be six hundred and fifty and 48-100 dollars.

We are of the opinion that plaintiff has failed to establish that his contract with the defendant was for a longer term than one year— that of 1897; and, indeed, the tendency of the evidence is to the effect that plaintiff had actually removed from the leased premises before the end of the year, and prior to the institution of this suit.

But, it necessarily results from the fact that the lease is held to have terminated on the 31st of October, 1897, that plaintiff is entitled to be re-imbursed for the stubble and seed cane then on the rented land, and which enured to the defendant's benefit, and the value of which approximates about $225.00—as we ascertain by a comparison made of other values mentioned in the evidence.

But, this claim is offset by the credits defendant's account gives the plaintiff for stubble and seed cane aggregating $238.50—thus making an offset.

The result of our investigation of this record, and a fair and dispassionate consideration of all the evidence and arguments, has led us to the conclusion that the judgment appealed from should be reduced from the sum of ($927.42) nine hundred and twenty-seven 42-100 dollars, to the sum of ($650.48) six hundred and fifty and 48-100 dollars; and that the two writs of sequestration should be dissolved.

In consequence of the dissolution of the plaintiff's writs of sequestration, it becomes necessary that we should pass upon the defendant's claim for damages.

On the record, and in view of our judgment dissolving the writs, we are of opinion that defendant is entitled to a reasonable compensation for his attorney's fees, and we fix the amount at fifty ($50.00) dollars; but, we are of opinion that his demand for special damges is not sufficiently established by proof, and that same should be rejected and disallowed.

It is therefore ordered and decreed that plaintiff's writs of sequestration be dissolved at his cost in both courts; and that the defendant do have and recover of and from the plaintiff the sum of fifty dollars, as attorney's fees for dissolving the writs of sequestration.

It is further ordered and decreed, that the defendant's demand for special damages be rejected and disallowed; and it is further ordered

and decreed that the judgment in favor of plaintiff and appellee be reduced to the sum of six hundred and fifty 48-100 dollars, and that as thus amended, the same be affirmed—the cost of appeal being taxed against the plaintiff and appellee.

Rehearing refused.