NADLIN, PLAINTIFF, *v.* STARICK, AS THE CITY MANAGER OF THE
CITY OF DAYTON, DEFENDANT.*

Common Pleas Court, Montgomery County.

No. 122879.   Decided August 23, 1963.

*Mr. Emanuel Nadlin,* for plaintiff.
*Mr. Herbert S. Beane,* for defendant.

McBRIDE, J.   In this taxpayer's suit, John Q. Public asks
what right Mr. Starick has to legalize gambling.   The answer
is that he has no right to do so.   The court will explain why not
and point out the dangers of such personalized law.

The legal problem is whether the court shall temporarily
restrain the defendant, Herbert Starick, Manager of the City
of Dayton, from enforcing the regulations and controls he estab-

---

*On September 10, 1963, the defendant elected not to plead and
agreed to an entry containing a permanent order enjoining the en-
forcement of the rules and regulations contained in the letter of June 28,
1963, and authorizing payment of fees to the attorney-plaintiff.   The en-
try was filed on September 10, 1963.

lished for the conduct of bingo in the City of Dayton and for the use of the Division of Police to enforce his program.

No other question is involved.

## TAXPAYER'S ACTION

The plaintiff, as a taxpayer, made formal demand upon the city to take action. This factor was stipulated. A statutory demand was made upon the Law Director on July 9, 1963, and he failed to take action.

That the Law Director did not and could not do so is apparent from the City Charter. Section 47 and 48 invests the City Manager with the power and the duty *"to see that the laws and ordinances are enforced"* and places both the Law Department and the Police Department under his control with power to remove directors and employees of such departments. Initiation of legal action by the City of Dayton was impossible under the conditions shown in this case because to do so would amount to insubordination and possible dismissal of anyone who disobeyed the City Manager.

## NATURE OF THE QUESTION

The law and public policy regarding lotteries is clear and well established. Lotteries are not only illegal but no agency of the state can directly or indirectly approve that which is prohibited. The Supreme Court held that local authorities cannot legalize or regulate lotteries. This court in *801 Recreation Association* v. *City of Dayton*, No. 103551, recently held in effect that the restraining power of the court cannot be used to legalize or protect the conduct of lotteries. Thus it is clear that the legislative and the judicial power may not be used to legalize, regulate or protect lotteries. If the City Manager has attempted to do so, the only question is whether he, as an officer of the executive branch of local government, can legalize, regulate or protect the conduct of lotteries by affirmative action of any nature, in this case by establishing conditions and restrictions and by staying law enforcement officers of the City of Dayton in the performance of their duties.

## MORAL ASPECTS

The court eliminates the "moral and ethical aspects" of the problem, referred to in the executive order of the City Manager. There is a difference of opinion on the moral aspects. The

desire to gamble and to avoid or (as the Manager suggests) to "reasonably compromise" the law on gambling has many friends who at times close their eyes to the law. The Manager's order is not simple neglect to enforce the law. On the contrary, it is a definite, affirmative step to legalize gambling. This is not neglect to enforce the law but rather an attempt to legalize limited gambling to be conducted by operators who are paid to do so, as outlined in the Manager's directive.

The fact is that the people of Ohio adopted and have accepted for generations a constitutional provision that gambling is wrong and unlawful under any circumstances and the people have stamped lotteries as "mala prohibita," forbidden whether right or wrong. Anyone who discusses the ethical or moral aspects or the existence of criminal acts by others in connection with the law is ready to justify his own disrespect for the law or his violation of the law.

The failure to amend the constitution and the laws on lotteries suggests that the number and interest of those concerned, including the city commission, has not been sufficient to initiate proper, democratic action.

An unpopular law may be changed by the people. It cannot be changed by those who are charged with the duty of administering it. It is the sworn duty of public officials to administer the law. It cannot be changed by the courts. It is the sworn duty of the courts to follow the law.

Legislation that is constitutional and regularly adopted by the general assembly or by the city commission cannot be disregarded because of personal opinions, because of "moral and ethical aspects" (to quote the Manager's letter), because "the members of the city commission are sympathetic to the resumption of charity bingo" or because of a personal desire to open the door to criminal acts but not to open the door "too wide." (Letter, p. 3.)

## FINDING AND ORDER

As will be hereinafter indicated, the court finds that the program of regulation and enforcement of limited (not wide open) bingo, contained in the letter and order of the City Manager constitutes legalized gambling, is unconstitutional, void, contrary to public policy, and not binding upon any city

director or employee. In addition the court finds that it is in violation of the ordinances of the City of Dayton adopted by the city commission which ordinances are still in full force and effect.

The request for a temporary order is granted forthwith. Counsel will prepare an entry within three days or the court will thereafter draft and file an entry.

The court fixes the compensation for services on the preliminary action only for counsel for the plaintiff at $1500.00 to be taxed as costs and paid by the City of Dayton when this action is terminated on the merits in plaintiff's favor or is otherwise terminated by consent.

In a summary action the court seldom writes an opinion. However the public nature of this case suggests additional comment.

## THE LAW

The "moral and ethical aspects" of lotteries and the "sympathy" of the friends of gambling for some but not for others has so clouded the problem that it is necessary to discuss the law in Ohio and more particularly in the City of Dayton, and to apply this law to the directive of the City Manager to bingo operators and to the law enforcement branches of the city government.

"LOTTERIES, AND THE SALE OF LOTTERY TICKETS, FOR ANY PURPOSE WHATEVER, SHALL FOREVER BE PROHIBITED IN THIS STATE." OHIO CONSTITUTION (1851), ART. XV, SEC. 6.

The word lottery is a generic term. It embraces all schemes for the distribution of prizes by chance for a consideration. This includes bingo.

The general assembly, municipal commissions, boards and public officers have no power or authority, directly or indirectly, to legalize, regulate, license, control or to otherwise take any affirmative action to approve, accept, or recognize as lawful any form of lottery, gambling or schemes of chance. This is true even though some of the income be set aside for charity. As the Supreme Court pointed out in the Cleveland and Columbus cases, such regulation is prohibited even though the so-called charity or Kane amendment attempted to remove the

penalty if the game was not conducted for a personal profit or consideration. (Section 2915.12, Revised Code.) That amendment did not repeal other statutes and it did not by inference authorize lotteries for charitable purposes. Sub-sections 1, 2, 4, 5, 6, 14 and 15 of Chapter 2915. *Columbus* v. *Barr*, 160 Ohio St., 209; *Amusement Co.* v. *Attenweiler,* 64 Ohio App., 105; *Kraus* v. *Cleveland,* 89 Ohio App., 504; *Kraus* v. *Cleveland,* 42 Ohio Opinions, 490 (CP), appeal dismissed 154 Ohio St., 80; *Zepp* v. *Columbus,* 50 Ohio Opinions, 47; 1961 OAG No. 2358; *State* v. *Moose,* 151 Ohio St., 19; *State* v. *Simonian,* 77 Ohio App., 210; *State* v. *Lloyd,* 30 Ohio Opinions, 441; 10 Ohio Jurisprudence (2d), 164, and many other Ohio cases.

The so-called charity or Kane amendment to Section 2915.12, Revised Code, has no application to this case. First, as the courts have stated, there are other lottery statutes that include bingo and in which the criminal penalty was not removed. Second, there is no need to go beyond the ordinances of the City of Dayton which unequivocally prohibit all schemes of chance without reservation or exception. Dayton Ordinances, 913, 914, 922, 923, 924. Third, public policy as stated in the constitution prohibits both lotteries and the control of lotteries.

Public policy in Ohio on gambling is confirmed in Section 3763.01 to Section 3763.08, Revised Code. These related civil statutes declare all gambling transactions to be void, authorize recovery of money lost in an action by the loser or by a person on his behalf. These civil statutes declare that leases may be canceled if premises are used for gambling or lottery and they create a judgment lien on the premises where the gambling was knowingly held. A party who obtains a judgment in such action may also recover exemplary damages above his losses of not less than $50.00 and not more than $500.00. Section 3763.08, Revised Code. This series of civil statutes contains no exceptions of any kind. It includes horse racing.

The charitable aspects of this case which has aroused "sympathy" was brought out in argument. Reference was made to the local case of *Help The Children, Inc.* v. *Commissioner of Internal Revenue,* No. 61955, filed August 30, 1956. 28 Tax Court, 1128. LeMire, Judge, found that the petitioner, a Dayton, Ohio corporation, failed to qualify for a tax exempt status.

Gross receipts for each of two years (1953, 1954) exceeded $300,000.00. Contributions to charity were less than 1% in 1953 and slightly over 1% in 1954. Annual salaries (personal profit) exceeded $25,000.00 in each year. Annual rental for use of a hall amounted to $42,000.00. This is the only official report of the charitable effect of a Dayton bingo operation. The "sympathy" is apparently misdirected.

## STARICK'S LAW

The court now turns to the directive of the City Manager, a copy of which was delivered to many responsible civic and religious organizations that desire to resume bingo operations in the City of Dayton, and to all interested departments and employees of the city.

As has been indicated, the City Manager has specific duties under the Charter. As chief executive officer, any directive from him is an order binding (if constitutional) upon directors of departments and employees of the city.

His letter of June 28, 1963, is an administrative order or directive and was intended to control all municipal law enforcement. His authority includes hiring and firing of subordinates, subject to civil service proceedings, in which he also has administrative review.

For convenience, a copy of his directive is attached. It is identified as Exhibit A in the record.

In its entirety, the directive discloses a purpose and policy of establishing affirmative conditions and regulations under which the City Manager assures those who may comply with his law that he will stop law enforcement branches of the city government from performing their duties or enforcing the law, including the municipal ordinances, regarding lotteries. The directive encourages violations of law.

The Manager's policy on law is clearly stated: to encourage and approve bingo for charity but to deny such operations to "big time gamblers and racketeers"; to open the door to lotteries but not "too wide." Who may be a small or a big time operator is apparently subject to his discretion.

The only argument advanced by the City Law Department in defense of the defendant's directive was that it does not amount to regulation of gambling but rather is an opinion to

private citizens as to when bingo is not bingo. The letter is in the form of legal advice and to that extent it may constitute the unauthorized practice. However, the directive is a public act by a public officer in a responsible position and it does, if sustained, control law officers within the city even though it is contrary to public policy and damaging to the general welfare of the community.

How good the City Manager's legal advice may be is a dubious question. The effort to substitute a membership fee as a consideration given for a prize is a shallow trick or subterfuge to encourage others to circumvent the law. It is unworthy of serious thought.

The only actual testimony offered was that from a participant who played bingo within the past week at an operation in Dayton at which one dollar was paid for the first card and twenty-five cents for each additional card. No attempt was made to take advantage of the fiction of a donation or membership, as recommended in the City Manager's directive.

Other affirmative conditions imposed by the City Manager in his effort to legalize gambling under his supervision demonstrate the extent to which he sought to open the door to gambling in Dayton without opening it "too wide";

(a) A limitation to organizations certified as "non-taxable" by the U. S. Treasury, Internal Revenue Service. (Item 1.) Others may not violate the law.

(b) Supervision over ultimate disposition of the "net" proceeds. (Item 2.)

(c) Limitation in Item 3 upon the amount of personal profit for the operators to a reasonable compensation or profit for their efforts in violating several laws, including a violation (among many others) of Section 2915.12, Revised Code. *Loder* v. *Canton*, 65 Ohio Law Abs., 517.

(d) Submission of financial statements and records for inspection by the City of Dayton apparently to determine the nature and extent of the unlawful operation to prevent the door from being opened "too wide." (Item 4.)

(e) Item 5 purports to authorize criminal conduct twice a week but never on Sunday and never with minors, possibly to avoid contributing to delinquency. It also suggests the ruse, a

rather shallow trick, of no legal significance, that calling cash a donation or a membership defeats the consideration for the game.

Each item, separately and collectively, and in connection with the general purpose of approving limited but not "too wide" open gambling is contrary to public policy, void, and unenforceable. No public funds may be used for the purpose of legalizing and supervising gambling.

The defendant's order indicates that his personal law on limited bingo operations is based upon the "intent" of the General Assembly in the enactment of Sections 2915.10 and 2915.12, Revised Code. He does not indicate that his action is in violation of city ordinances, is contrary to the constitution and is contrary to the construction by the Supreme Court of the same section upon which he relies.

## WHEN BINGO IS NOT BINGO

To avoid a gamble, participation must be purely gratuitous with no direct or indirect consideration, condition, entrance fee, membership fee, or gift to entitle one to be eligible for a prize. If there is no consideration and no gamble there is nothing from which charity could benefit; thus, the claim that the games are not gambling defeats its own argument. The Manager has not found a lawful method to operate an unlawful game that will benefit any charity.

It is conceivable that bingo may be conducted for entertainment purposes if there is no consideration given or in the alternative there is no prize. However restriction by way of membership, fees, donations, or other form of subterfuge for a consideration must be scrutinized carefully by the court.

## DANGER IN STARICK'S LAW

Without further commenting upon the directive of the City Manager it is obvious that he has established conditions and restrictions upon an unlawful operation, the implication being that because of his public office no criminal proceedings would be undertaken by his office, by the Police Department or by the Law Department to enforce the law if the defendant's personal conditions and restrictions were carried out by the bingo operators. This is regulation and control such as was stricken down by the Supreme Court and is even more subversive to

43

public policy and welfare than legislative action which is more readily tested in court.

The fact that such action is taken in the name of charity and not with a criminal syndicate adds nothing to its legality. The so-called "big time operators" would be equally grateful for this type of gambling because it does open the door to them, ever so slightly, as indicated in Item 3 of the directive. Initially they would be satisfied with a reasonable profit to be fixed by the defendant.

The power and function of the City Manager does not include such purposes. It does not include the establishment of laws or regulations. It does not include directives, as contained in his letter, to subordinates to disregard their oaths and the established law.

The activity of the defendant is not only void under Article XV, Section 6, but it also is a usurpation of political and judicial power.

The real harm of the Manager's letter, its danger to public welfare and its damage to respect for the law and its enforcement is apparent under the directive since police officers and city attorneys may not take any action in performance of their sworn duties without fear of reprisal from the defendant and the power he wields under the Charter.

Once before this court passed upon an unconstitutional order issued by a superior officer of a municipality to a member of the law enforcement department. *Roller* v. *Stoecklein*, 75 Ohio Law Abs, 453. This court held that such officer could not be removed for insubordination because he refused to obey an unconstitutional order of his superior. In this instance the legal department would have been justified in refusing to appear in defense of the defendant. However their appearance did facilitate disposition of the motion for the temporary order.

Whether an act is lawful or unlawful must be determined by due process of law. It cannot be determined by executive fiat by one individual who adopted his own law. And it cannot be determined through due process of law where enforcement officers are compelled to avoid their sworn duty by fear of reprisal for insubordination.

*      *      *      *

Disregard for the very structure of government and violations of fundamental law by public officials in any branch of government must be summarily and swiftly restrained. No one enjoys exercising the power necessary to accomplish this. If government is to remain one of law and not of men and if the separation of power is to be preserved under the charter form of government, it must be done.

---

EXHIBIT A

June 28, 1963

Mr. Joe Shump, President
Frigidaire Local 801
313 South Jefferson Street
Dayton 2, Ohio

Dear Joe:

At the request of your organization and others interested in operating bingo to support charitable and civic activities, this matter has been carefully reviewed—and particular attention has been given to your concern that if bingo is permitted to operate in Montgomery County under the provisions of State Statutes, Dayton ought to permit the same kind of operation where there is clear evidence that the primary purpose is to provide a source of revenue to support charitable programs and civic activities.

As you may recall, it was the threat of big-time, commercialized bingo moving into Dayton—and the possibility of big-time gamblers and racketeers entering the Dayton picture—which caused our problem back in 1962. The City of Dayton desires to be reasonable in this matter, and our concern has been to devise an enforcement program which will permit charitable bingo operation and still keep out the undesirable element. On the basis of our discussion, I am sure you agree with this point. Further, I have had the opportunity to talk with the members of the City Commission and many citizens on the community moral and ethical aspects of the problem. As you might sus-

pect, opinion is varied. Some citizens feel that bingo, operated under adequate control, is no worse than donation-type raffles for prizes ranging from turkeys to automobiles which have been operated in Dayton for many years. The argument also has been advanced by many that bingo, operated under reasonable controls, should be classified as a form of recreation. And, there are many who just don't care what happens on bingo.

As you know, the members of the City Commission are sympathetic to the resumption of charity bingo on a controlled basis. The problem is—what type of enforcement program will produce the desired results?

I have reviewed the suggestions in your recent letter, and the ideas submitted by Mr. Albert Scharrer. It has been concluded that an enforcement program—based on the following points—will be consistent with the intent of the Ohio General Assembly in the enactment of Sections 2915.10 and 2915.12, Revised Code, and related sections of the Ohio General Code:—

1. Bingo games may be operated only by charitable or non-profit organizations certified by the U. S. Treasury Department, Internal Revenue Service, as eligible to file a "Non-Taxable Exempt Organization Return."

2. Net proceeds from bingo game operations shall be used for charitable or civic activities.

3. Organizations shall expend for payroll, operators' salaries, and rentals only reasonable sums.

4. All charitable or non-profit organizations shall submit to the City of Dayton a copy of the annual financial report which State law requires be filed with the County Clerk of Courts and the State Attorney General. In addition, such organizations shall file with the City of Dayton semi-annual financial statements on July 15 and January 15 of each year, prepared by a Certified Public Accountant, accounting for all income and expenditures resulting from bingo operations. The report shall

be prepared in a manner to show gross receipts, operating expenses, prize money and expenditures for charity. In addition, all accounting records shall be available for inspection by the City government at any reasonable time.

5. Bingo games shall be played not oftener than twice each week, with no games played on Sundays; play shall be limited to the hours from 7:00 P. M. to 11:00 P. M.; revenues are to be derived from donations or memberships; the maximum prize shall be limited to $750.00; no alcoholic beverages are to be sold on the premises; no minors shall be permitted to play.

It is my sincere hope that this enforcement program will be accepted by those "for" and those "against" bingo as a reasonable compromise that will favor charitable and non-profit organizations engaged in constructive community activities and, at the same time, provide a basis for keeping out gambling syndicates and racketeers who are always ready to move in and take over if the door is opened too wide.

If your organization is willing to operate within the limits of this program, please advise me. I will advise the Division of Police on the details of this enforcement program.

Sincerely yours,
Herbert W. Starick
City Manager

HWS/pg
CC—Mr. Horlacher
Chief Caylor
Mr. Beane
Mr. Phillips
Mayor Somers
Commissioner Malone
Commissioner Schell
Commissioner Crawford
Commissioner Hall
Mr. Mauch