175 So. 50

**STATE v. BARBEE.**

No. 34250.

May 24, 1937.

George T. McSween, of Shreveport, for appellant.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., and Frank W. Hawthorne, Dist. Atty., and George W. Lester, Asst. Dist. Atty., both of Monroe, for the State.

LAND, Justice.

Defendant is charged by information with unlawfully establishing, setting up, and engaging in the operation of a lottery in the parish of Ouachita on or about the 2d of June, 1936.

As the offense charged is a misdemeanor, defendant was tried by the court, found guilty as charged, and sentenced to pay a fine of $500 and costs, and, in default of payment, to serve six months in jail subject to road duty.

Defendant has appealed from the conviction and sentence pronounced against him.

The information filed in this case charges that defendant "on or about the 2nd day of the month of June, Anno Domini, 1936, in the Parish and State aforesaid, did then and there wilfully and unlawfully establish, set up and engage in the operation of a Lottery contrary to the form of the Statute of the State of Louisiana," etc.

Defendant demanded a bill of particulars setting forth the following: "Whether or not said lottery was operated in person or by agents.

"The kind of machinery used in the operation of said lottery.

"Whether or not more than one person was engaged in said lottery.

"In the event it is shown that a marble table is used, whether same is such a table as licensed under Act No. 5 of the First Extra Session of 1935." Tr. p. 5.

In answer to the motion for bill of particulars, the district attorney says: "1. That the defendant, R. L. Barbee, on some date prior to the date charged in the Bill of Information, placed a marble table known, designated and named as a 'Screamo' in a place of business in the City of Monroe, Parish of Ouachita, known as the Stagg Pool Hall, with one John Williamson as Proprietor; that same 'Screamo' marble table was a scheme for the distribution of property or money by chance or lot among persons who paid, or agreed to pay, a valuable consideration for the privilege of participating in such scheme; that the said R. L. Barbee received the money or consideration paid by all individuals participating in said lottery and also paid the winner, or winners, from his own funds, and for the privilege of placing said ma-

chine in the Stagg Pool Hall, paid to one John Williamson, the Proprietor thereof, twenty-five (25%) of the net profits realized in the operation of said lottery; that the winners of said lottery were paid in cash, or merchandise, according to the amount each won, from 10¢ to $2.00, as above designated, by John Williamson, as agent for the said R. L. Barbee, and in turn the said R. L. Barbee reimbursed, or refunded, to the said John Williamson all sums so paid.

"2. That the said R. L. Barbee did establish, set up and engage in the operation of said lottery as charged in the Bill of Information by placing a nine ball marble table in said Stagg Pool Hall, said marble table being named and designated a 'Screamo'; that to participate in said lottery, the participant would deposit the sum of 5¢ in a slot attached to said marble table, and thereafter, by means of a plunger, attempt to place nine balls which were played one after another in certain holes in said table, which holes were under a panel of glass, each ball upon falling in a hole under said glass would in turn light an electric bulb behind a number situated in a board or panel at the rear of said table. Under the panel of glass there were a great number of holes with little wire brackets and wire pins in the vicinity of each hole to deflect and alter the course of each ball as same was played by the participant, and in the event the participant was successful in causing the nine balls in question to fall in certain designated holes, thereby lighting the lights behind the numbers in the panel or board at the rear of the table in certain diagrams, series or combinations, he would then be paid a prize from 10¢ to $2.00, de-pending upon the diagram or series of lights which he had been successful in lighting, as above set forth. In the event the player was unsuccessful in causing the lights behind the numbers on the panel or board at the rear of the table to light in certain series, combinations or diagrams, there being many series, combinations and diagrams for which no prize was paid, the amount deposited in the slot attached to said machine, being 5¢, was lost by the player or participant.

"3. That during the time the machine, or marble table in question, was located in the Stagg Pool Hall, it was played and operated many times by any person desiring to do so, as above set forth, the consideration for said play being received by Defendant, R. L. Barbee, and he, in turn, paying to the player, through his said agent, John Williamson, any prize or money won.

"4. That said table was a scheme for the distribution of property or money by chance or lot among persons who paid a consideration for the privilege of playing said machine, as above set forth, and therefore same was a lottery." Tr. pp. 8, 9, and 10.

■ 1. After bill of particulars was filed, a motion to quash the information was made, on the ground that same does not charge any crime or offense under the laws of the state of Louisiana. This motion was objected to by the State as coming too late. The motion was argued and overruled. Tr. pp. 7 and 11. As the counsel for defendant requested that he be arraigned without prejudice, and the defendant was so arraigned, the objection by the State that the motion to quash should have been made before arraignment is not well taken, under

article 284 of Dart's Code of Criminal Procedure. Tr. p. 4.

2. It is to be noticed that defendant, in his motion for a bill of particulars, made no objection as to the vagueness of the date of the offense charged, "on or about June 2, 1936," and no request was made by defendant that the State specify the particular date as to the alleged commission of the offense, and be restricted in its proof to that date.

But, on the trial of the case, defendant objected, for the first time, to the introduction of any testimony, under the bill of information filed, for the reason that in the answer to the bill of particulars the date is made vague and indefinite. Tr. p. 14.

This objection was overruled by the trial judge, as well as defendant's motion to quash. Defendant reserved bill of exceptions No. 1 to these rulings, and it is the only formal bill taken during the trial in the court below. Tr. p. 54.

In the per curiam to this bill, it is stated by the trial judge that: "Defendant, in his motion for a Bill of Particulars, made no objection as to the date charged in the Bill of Information, nor did he ask if the State relied on the specific date charged therein, but on the contrary requested certain other information. The Court, in its discretion, ordered the State to furnish defendant with certain information and the State complied with the order fully in its answer to the motion for a Bill of Particulars.

"In the opinion of the Court, the Bill of Information having charged a crime under the laws of this State and the State having furnished the defendant with certain information requested by him, the objection to any testimony thereunder is without merit.

"The information itself charges the crime in the language of the statute, Act No. 12 of the Second Extra Session of 1934, and the answer to the Bill of Particulars clearly shows the operation of a Lottery as defined by the Supreme Court.

"During the trial the Court actually observed and saw the machine played and found that the same was a scheme for the distribution of cash awards from 10¢ to $2.-00, by chance or lot, among persons who paid a valuable consideration, namely: the sum of 5¢ for the privilege of playing the machine, some winning an award, the majority losing, and that there was no element of 'skill therein."

3. As the motion in arrest of judgment filed by defendant in this case is based upon the same grounds as the motion to quash, both motions, in our opinion, were properly overruled by the trial judge.

As stated in the per curiam to bill of exceptions No. 1, this prosecution is brought under Act No. 12 of the Second Extra Session of 1934.

The information in this case is framed under section 1 of Act No. 12 of the Second Extra Session of 1934, which declares: "That it shall be unlawful to establish, set up, promote, operate, manage, advertise in any manner or by any device, or engage in, lotteries, as an individual, partner, stockholder, officer, manager or general director."

Not only does the information follow the words of the statute, but the answer of the district attorney to the demand of defend-

ant for a bill of particulars has given to defendant all of the information requested by him.

Act No. 12 of the Second Extra Session of 1934 does not define the word "lottery," nor has any prior act of this State done so.

In State v. Lasselle et al., 154 La. 168, 97 So. 389, the defendant was indicted and convicted for the crime of operating a lottery. In that case the Supreme Court, through Justice Dawkins as its organ, said at pages 169 and 170 of 154 La., 97 So. 389, 390: "The first section of the statute declares:

" 'That whoever shall establish, set up, draw or run a lottery in this state, for himself or for others, as an individual, partner, shareholder, officer, manager, or agent, shall, upon conviction, be imprisoned, with or without hard labor, not more than one year and fined not exceeding one thousand dollars one-half of such fine to go to the informer securing the conviction, and the other half to go to the city of New Orleans, or parish in which the offense is committed.'

"There is no doubt but that the evil intended to be reached by Act No. 169 of 1894, as demonstrated by the contemporaneous political history of the state, was a lottery such as was conducted by the famous Louisiana Lottery Company. However, the statute does not define the word 'lottery,' and we are bound to look elsewhere for its meaning. It seems to have been used in the ordinary sense, as defined by lexicographers and the common law. As defined by Webster's New International Dictionary, it means:

" 'A scheme for the distribution of prizes by lot or chance; especially a scheme by which one or more are distributed by chance among persons who have paid or promised a consideration for a chance to win them, usually as determined by the numbers on tickets as drawn from a lottery wheel.'

"Bishop on Statutory Crimes, § 952:

" 'Lottery is any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value or nothing, *as some formula of chance* may determine.'

"See, also, City of Shreveport v. Kahn, 136 La. 371, 67 So. 35, and authorities cited therein.

"Hence, from these definitions, it would seem that *any scheme* for the distribution of a prize or prizes among those who have paid for the privilege of betting, dependent upon chance, is a lottery." (Italics ours.)

In City of Shreveport v. Kahn, 136 La. 371, 372, 67 So. 35, it was again contended by defendant that Act No. 280 of 1914, to amend and re-enact section 12 of Act No. 107 of 1902, entitled an act to grade misdemeanors, said section grading the offense of conducting a lottery, was aimed only at lotteries like the old State Lottery Company, which issued tickets signed by them, and entitling on their faces the holders to a chance in some prize to be drawn.

But this court, in the Kahn Case, as in the Lasselle Case, repudiated such contention, and held that: "The term 'Lottery' has been judicially defined as follows:

" 'The term "lottery" has no technical meaning in the law distinct from its popular significance. A lottery is a scheme for the distribution of prizes by chance.'

" 'The word "lottery" as used in the statute forbidding the same is used in its ordinary and popular sense. The statute aimed to prohibit that species of gambling.'

"See Words and Phrases [First Series] vol. 5, p. 4245." City of Shreveport v. Kahn, 136 La. 371, 377, 378, 67 So. 35, 37.

See, also, State v. Boneil, 42 La.Ann. 1110, 8 So. 298, 10 L.R.A. 60, 21 Am.St. Rep. 413, and City of New Orleans v. Collins, 52 La.Ann. 973, 27 So. 532.

In the latter case, Chief Justice Francis T. Nicholls, as the organ of the court, said at page 982 of 52 La.Ann., 27 So. 532, 536: "A lottery has been defined to be 'a scheme for the distribution of property, by chance or lot, among persons who have paid or agreed to pay a valuable consideration for the privilege of participating in such scheme.' The crime of conducting a lottery is similar to that of gaming, and in fact a lottery is a species of gaming. The evil which the law is designed to remedy is much the same as in gaming; being the excitement of an inordinate desire for gain, leading to an arousing of the baser passions, and tending to mendicancy and idleness.

"In applying the law the courts have taken this as the evil to be remedied, and uncertain or doubtful terms have been construed with this object in view. As a rule, lottery schemes have no distinct names, as have many of the well-known games; but some schemes or devices having distinct names have been held to be lotteries, such as playing policy, raffles, pools (as on horse races), gift enterprises, and any scheme for the sale of goods or merchandize whereby

a prize is given to some buyer, to be determined by lot or chance.

"These schemes are so various that it is difficult to cover them, even by a general description; but in most of them the chance to secure something of value by lot, usually evidenced by a ticket, is given as an additional inducement to the purchase of goods of a particular description or of a specified value.

"There can be no doubt that 'the effect of lotteries upon public morals is such as to cause them to come within the power of police regulations of the states,' and we may add, of police regulation of the municipal corporations of the state, under delegated police powers. McClain, Cr.Law. §§ 1315–1317."

4. The evidence in the case has been annexed to and made part of bill of exceptions No. 1, reserved by defendant to the overruling of the motion to quash the indictment in this case.

This motion raises the question as to whether the machine operated in this case is one used as a lottery scheme or device for the distribution of prizes by lot or chance, or whether it is a mere game of skill.

The further question raised is whether this machine is one operated merely for amusement, and may be licensed under Act No. 5 of the First Extra Session of 1935.

The trial judge in his per curiam to bill of exceptions No. 1 does not state the facts of the case, but merely announces his conclusion drawn from the evidence taken on the trial of the case, that the machine was a scheme for the distribution of cash awards

from 10 cents to $2, by chance or lot, among persons who paid the sum of 5 cents for the privilege of playing the machine, some winning an award, the majority losing, and that there was no element of skill therein.

The conclusion reached by the trial judge from the facts of the case clearly shows the operation of a lottery as defined by the Supreme Court of this State in numerous cases. However, merely to adopt such conclusion, without reviewing the evidence annexed to the bill of exception, and determining from such review whether this conclusion is founded upon the law applicable to the facts of the case, would be, practically, not to review at all the issues presented by the bill of exceptions, and the defense made in this case.

■ It is well settled by the decisions of this court that we have no appellate jurisdiction over the facts affecting the guilt or the innocence of the accused. Be that as it may, the issues involved in this case present questions of law, which necessarily are founded upon a particular state of collateral facts.

The machine operated is known as a "nine ball marble table," and is styled a "Screamo."

The top of the machine is inclosed by glass. Under this glass are two layouts, each divided into 25 small squares, like a checkerboard. These layouts are located, one behind the other, and are about two inches apart.

Each of the twelve squares in the layout next to the end of the table has a number on it and a marble hole, or a hole the size

of a marble, in it. The middle square in the layout is marked "Free," and is without a number or a marble hole. The remaining twelve squares in the layout have neither numbers on them nor marble holes in them.

In various places in these squares, and along some of their edges, are placed wire pins and wire brackets, of sufficient height and strength to deflect the course of a ball or marble, after it reaches the layout.

The layout next to the front of the table contains the same number of squares with numbers on them and holes in them, and the same number of squares without numbers or holes in them. The middle square, being marked "Free," is without a number or hole. In this layout also are wire pins and wire brackets of sufficient height and strength to deflect the course of a ball or marble. There are also two holes at the front of the machine, marked "Free Play," and a hole at the end of the table with "Screamo" marked beneath it.

The numbers and holes in each layout are placed irregularly, and in different locations.

At the end of the table is a glass panel marked "Screamo," with twenty-five numbers beneath the word "Screamo," arranged in five rows of five numbers each, or in the form of a square.

The "Screamo" machine is operated from the front end by placing a nickel in the slot. When this is done, the nine balls or marbles which are already in the holes, in various positions in the layouts, disappear beneath the layouts. There are two plungers at the right side of the front end of the machine. The lower plunger is pushed in to bring up

a ball or marble to its place in a groove to be shot, and the upper plunger is pulled out to shoot the ball or marble. The face of the machine is an inclined plane, and, when the ball or marble is shot, it begins its course towards the end of the machine, which is elliptical or circular in shape, on its way to the hole marked "Screamo." Just as the ball or marble leaves its groove at the lower end of the machine on its way to the "Screamo" hole, it encounters a double row of wire pins. If it misses the "Screamo" hole, it rebounds in the direction of the layout at the lower end of the machine. The first row of this layout consists of five small squares, three of which have no holes, the remaining two having holes marked Nos. 21 and 40. When the ball gets into this layout, there are numerous wire pins and wire brackets around some of the holes, and even in squares which have no holes, to be encountered, and which of course deflect the course of the ball or marble.

If the player should succeed in placing some of the balls in holes, the numbers to which he is entitled are flashed in the glass panel marked "Screamo" at the back of the machine. But, in order to win at all, he must make, according to the printed "Instructions" placed in the front of the machine, "2 skill points," "3 skill points," "5 skill points," "7 skill points," "10 skill points," or "20 skill points," according to certain diagrams or formulæ printed on the "Instructions," and doubles his skill points or winnings if he also makes the "Screamo" hole.

On the other hand, there are many series, combinations, and diagrams for which no prize is paid, and the amount deposited

in the slot attached to the machine, 5 cents, is lost by the player.

For 5 cents, the player is entitled to shoot all of the nine balls or marbles, one after the other and, if he wins according to certain diagrams or formulæ, he has a right to participate to that extent in the distribution of cash awards from 10 cents to $2.

The numbers in the glass panel at the back of the machine, which may be flashed by the balls as they enter the various holes, are on smaller squares and from a large square as follows:

| 11 | 21 | 31 | 41 | 51 |
| 12 | 22 | 32 | 42 | 52 |
| 13 | 23 | Free | 43 | 53 |
| 14 | 24 | 34 | 44 | 54 |
| 15 | 25 | 35 | 45 | 55 |

In order to make 2 "skill points," 10 cents, the player would have to light "any one line up and down"; i. e., 11, 12, 13, 14, 15 or some other line up and down. In order to make 3 "skill points," 15 cents, the player would have to light "any one line across"; i. e., 11, 21, 31, 41, 51, or some other line across. In order to make 5 "skill points," 25 cents, the player would have to light the diagonal line of numbers 15, 24, 42, 51, the middle number being "Free." In order to make 7 "skill points," 35 cents, the player would have to light the diagonal line of numbers, 11, 22, 44, 55, the middle number being "Free." If the player lighted 11, 21, 31, 41, 51 and 32, 34, 35, forming a "T," the middle number being "Free," he would make ten "skill points," or 50 cents. If the player lighted 11, 22, 44, 55, and 15, 24, 42, and 51, forming a cross, the middle number being "Free," he would make 20 "skill points" or

$1. On the middle square of the twenty-five numbers is a circle marked "Free," and, when it is in a combination necessary to be made to win, it is counted as a number. If, in addition to making the cross, the player also succeeds in getting the ball or marble into the hole marked "Screamo," he would double his 20 "skill points," or $1, and make $2.

See testimony of John Williamson, State witness, who operated the machine in the lower court in the presence òf the trial judge. Tr. pp. 22 and 23.

5. That the "Screamo" machine played in this case is a lottery, or purely a scheme or device for the distribution of prizes by lot or chance, is made evident by its operation by this witness. When we consider the difficulty of lighting the numbers, according to the various diagrams or formulæ contained in the "Instructions" or rules for playing the game, and when we consider the interference with the balls or marbles by the various wire pins and wire brackets in the layouts, the contention that the game of "Screamo," played in this case, is a game of skill, and not of chance, is not borne out by the facts of the case.

As to *the skill* required to operate the machine, Williamson testified as follows on cross-examination by defendant's counsel:

"Now, a person sufficiently skilled can, with a great degree of accuracy, determine the stopping place of these marbles (balls) held on this plane, can he not?

"A. Can do what?

"Q. I say, a skilled player, with experience * * *

"A. They might be *a few* at that: *but we stopped them before they went too far.*

"Q. There are people who got so proficient that you declined to let them play on the machine?

"A. If he's *too good, yes, we stop him.*" Tr. p. 30. (Italics ours.)

Williamson testified on redirect examination by the district attorney that the machine was seized on the morning of June 2, 1936, and had been "robbed" the night before—meaning that he had taken the money out of the machine the night before—but stated that there was some play on the machine afterwards. There were thirty-two nickels in the machine when it was seized.

"Q. Does it cost five cents to play the machine one time?

"A. Yes, sir.

"Q. Had the machine been played thirty-two times, until it was robbed?

"A. From the time I checked it, yes.

"Q. Thirty-two times?

"A. Yes, sir." Tr., p. 32.

Here are thirty-two losses in thirty-two plays. Manifestly, they were not skilled players.

"Q. With reference to the *skillful feature*. Can you name to me any individual who can take that machine, and put a ball in the hole on the light designating down *at the bottom* of that table?

"A. Not at *the bottom*.

"Q. Can anybody put a ball in the hole at *the top* of that table?

"A. He *might* get one in there.

"Q. Can he put it in a particular, designated hole?

"A. People can shoot into those four holes *at the top*.

"Q. How about the series of holes before the top holes surrounded by the wire pins?

"A. Some of them can come *pretty close* to that.

"Q. Do you know anyone who can take that machine and put one of those balls in a designated hole, in *the bottom* of the machine?

·."A. No, sir.

"Q. Why can't they?

"A. It's too hard to do.

"Q. What keeps people from doing it?

"A. You have nothing there to  *  *  * it's just which way the ball gets started, it's going. If it hits those pins and pegs, *it will knock you* out of there.

"Q. After it hits those pins and pegs, can you control that ball?

"A. Not very well.

"Q. *To win a prize,* you have to light *some of those bottom holes,* do you not?

"A. *Some* of them, yes, sir." Tr. p. 33. (Italics ours.)

If a player cannot *by skill* put one of the balls in a *designated* hole in *the bottom* of the machine, and if, *to win a prize,* he has to light *some* of those *bottom* holes, it is certain that the playing of the "Screamo" is not a matter of skill but one purely of chance.

On cross-examination by counsel for defendant, Williamson testified as follows:

"Q. Do you recall ever paying anybody anything out of that machine, Mr. Williamson?

"A. You mean to pay the player who shot, or who it belonged to, or what?

"Q. The people who shot.

"A. Oh, yes; *very seldom* we ever paid them *$1.00,* though.

"Q. Can you name one you paid anything?

"A. Yes, paid *a dime, twenty cents.*

"Q. Who did you pay that to?

"A. Whoever shot the machine.

"Q. When did you ever pay any person you can name, anything?

"A. I couldn't give out the name of anybody I paid to, no.

"Q. Not a soul, can you?

"A. I can't name a soul." Tr. pp. 29, 30. (Italics ours.)

Although the prizes to be distributed run from 10 cents to $2 at 5 cents a play, this witness does not mention every having paid *$2* to any one. He states *"very seldom* we ever paid them *$1.00* though," the highest prizes distributed being *10 cents and 20 cents.* It is idle to refer to the playing of the "Screamo" as being *a matter of skill* under such a state of facts, particularly since a player showing any skill is at once *stopped* and barred from the game. The unskilled players therefore constituted a large majority of the patrons who played at this machine.

The fact that the "Screamo" machine did not have an "automatic pay-off" like a slot machine is of no moment in the

present case, since Williamson testified that, as the agent of defendant, he paid off all the winners out of his cash register and that, after he was reimbursed by defendant, the rest of the money was divided "fifty-fifty" between them. Tr. pp. 26, 29.

6. The defense is made in this case that the "Screamo" machine is a "marble table" machine, is subject to the occupation license laws of the State under Act No. 5 of the First Extra Session of 1935, and that an occupation license for the year, 1936, attached to the machine, was issued by the Supervisor of Public Accounts.

The Assistant Supervisor of Public Accounts was called as a witness by defendant, and admitted that an occupation license was issued by his department, but stated that, had he known that the machine was paying prizes in money or merchandise, instead of being operated for amusement, for which it was licensed, the license would not have been issued.

The facts already reviewed in this opinion show clearly that the "Screamo" machine in this case is a lottery scheme or device and, for this reason, cannot be licensed by the Legislature of the State.

In passing upon this point in City of New Orleans v. Collins, 52 La.Ann. 973, 979, 27 So. 532, 535, Chief Justice Francis T. Nicholls said: "Article 188 of the constitution declares gambling to be a vice, and orders the legislature to pass laws to suppress it; and article 178 prohibits lotteries, or the sale of lottery tickets, in the state. If a slot machine, used as it has been charged to have been used by the defendant, was, in point of fact and law, either gambling or a lottery, we are driven by force of the situation from the idea that the general assembly intended to give it its sanction, either directly or indirectly.

"We would be no more justified in attributing such an intention to the legislature in enacting the fourth section of Act No. 57 of 1898, than we would have been in adopting that attempted to be ascribed to it in enacting the proviso contained in the statute which was before this court in State v. Olympic Club, 46 La.Ann. 935, 15 So. 190, 24 L.R.A. 452, and [Id.] 47 La.Ann. [1095] 1098, 17 So. 599.

"Any construction of the statute, or any portion of it, which would lead up to, and carry with it, as the result of the construction, the justifying or legalizing of any form of lotteries, or of any kind of gambling, would convert a *prohibitory, preventive, and repressive statute actually into a permissive one*. This court is not warranted in placing the legislature in any such attitude." (Italics ours.)

Article 19, section 8, of the Constitution of 1921, declares: "Gambling is a vice and the Legislature *shall* pass laws to *suppress* it. * * *

"Lotteries and the sale of lottery tickets are *prohibited* in this State." (Italics ours.)

Defendant is indicted under Act No. 12 of the Second Extra Session of 1934. Section 1 of this act declares: "That it shall be *unlawful* to establish, set up, promote, operate, manage, advertise in any manner or by any device, or engage in, lotteries, as an individual, partner, stock-holder, officer, manager or general director." (Italics ours.)

The present Constitution of 1921 makes it the *mandatory duty* of the Legislature *to suppress* gambling as *a vice,* and *prohibits* lotteries and the sale of lottery tickets in this State.

■ If Act No. 5 of the First Extra Session of 1935 may be construed as permitting the license of lotteries in this State, this act would be clearly unconstitutional as to such license, as it would have been passed in violation of a prohibitory law.

■ It is not possible under the Constitution and laws of this State to license gambling as a lawful occupation, nor is it possible to license the operation of a lottery as a lawful occupation.

Act No. 5 of the First Extra Session of 1935 is an act to amend and re-enact Act No. 15 of the Third Extra Session of 1934, entitled "An Act relative to license taxes," etc.

Section 20 of this act provides: "That for keeping billiard tables, pigeonhole, jennylind, pool or bagatelle tables, ten-pin alleys, domino tables, miniature pool and billiard tables, and *marble tables* or other games or devices of similar character, from which revenue is derived, a license of five dollars ($5.00) *for each such table,* alley or gallery shall be paid, in addition to any other license paid by the establishment in which said *tables,* alleys or galleries may be situated." (Italics ours.)

This section is clearly unconstitutional, in so far as it relates to licenses on "marble tables," used as gambling schemes or devices for lotteries. And so would be the licensing of such "tables" for such purposes in any subsequent act of the Legislature.

■ The evidence shows that the machine was not operated in this case a single time for amusement, but was used continuously for gambling purposes, after being placed by defendant in the Stagg Pool Hall in the city of Monroe, La., which was operated by John Williamson, proprietor of the place.

Defendant testified that he had 70 or 80 "marble tables," "Screamo" machines of different types, scattered throughout the State.

"I was told," the defendant stated, "by the Bureau of Identification Department at Baton Rouge, also by the Supervisor of Public Accounts at Baton Rouge, that these type marble tables—license would be issued, and they were perfectly legal." Tr. pp. 43, 46.

Defendant testified positively that these machines were not slot machines. Tr. p. 43.

It may be true that the operation of a "Screamo" machine, if played for amusement, without awards or prizes given, is legal, and subject to license. However, the fact remains that "Screamo" machines of the same type as that filed in evidence in this case can be used for gambling purposes.

The motion for new trial, based on the ground that the verdict was contrary to the law and the evidence, was overruled by the trial judge, and presents no question of law for review by this court.

The trial judge found the defendant guilty of operating a lottery. He was the sole judge of the weight and sufficiency of the

evidence affecting the guilt or innocence of the accused.

For the reasons assigned, the conviction and sentence appealed from are affirmed.

O'NIELL, C. J., and ODOM, J., took no part.