**A. B. LONG MUSIC COMPANY et al.,**
**Appellants,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**R. BRINDLEY et al., Appellants,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 21, 1968.

William E. Scent, Reed & Scent, Paducah, for appellants.

Robert Matthews, Atty. Gen., Frankfort, Paul R. Huddleston, Sp. Asst. Atty. Gen., Bowling Green, for appellee.

MONTGOMERY, Judge.

Eighteen pinball machines were adjudged to be condemned and forfeited to the Commonwealth of Kentucky pursuant to KRS 436.280. The judgment was based on a jury verdict finding that the machines "were intended to be used for the purpose of gambling." The separate appeals of A. B. Long Music Company et al. and R. Brindley et al. have been consolidated. The primary question is whether the machines seized "were intended to be used for the purpose of gambling" and, therefore, were subject to condemnation under the statute.

The testimony shows that the machines possess the same basic characteristics and are similar to the machines forfeited in United States v. Two Coin-Operated Pinball Machines, W.D.Ky., 241 F.Supp. 57 (1965), decided about a month before these machines were seized. One machine is described as being typical of all of the ma-

chines. It is described as the bingo-type amusement machine with a multiple coin device, meaning that more than one coin can be played into it on any given game. It has a multiple free-game device, in that more than one free game can be scored in playing. It has a five-ball device for playing with "the three balls which may be obtained by playing additional money or free games back into the machine."

The playboard has twenty-five holes, numbered one through twenty-five, and one ball-return bowl at the base of the board. The holes are arranged in a series of lines, with a seven-hole line at the top and each succeeding line having one less hole. The ball-return bowl is in the center of the board below the middle of the last line. There are a number of pegs on the playboard, each capped with a rubber bumper which causes the ball to bounce on striking and to follow a diverted path down the playboard. Around the edges of the playboard are a number of springs which serve to keep the ball bounced back into the playing area.

The machine is played by ejecting a ball onto the playing area. There are no movable flippers, bats, or obstructions by which the player may attempt to influence or control the descent of the ball. The machine has a tilt mechanism which stops the play when the machine is tilted by being nudged or pushed.

On the face of the machine there is an upright screen which has twenty-five numbers corresponding to the twenty-five numbered holes on the playboard. The object of the play is to shoot the balls into the playboard holes in such a manner that a winning combination is achieved by the lining up of the balls in holes in either a red, yellow, or green line corresponding to the same number on the card on the upright screen. The card corresponds generally to the well-known bingo card. Additional chances are presented by certain colored sections of the screen and may become available by play of a sufficient amount of money. On the front of the board are three lighted sections, red, yellow, and green, which indicate the number of free replays which are given, depending upon the number of balls dropped into one of the colored lines. By this means, the odds are determined which may be advanced by using an additional coin.

The testimony concerning the description and operation of the machines was given in detail by a special agent of the Federal Bureau of Investigation who had been assigned as a specialist to the Bureau's laboratory to "examine electrical and mechanical evidence of various types." He had been with the Bureau eighteen years, the last eight of which he was with the laboratory. Among other qualifications, the witness had a Bachelor of Science degree in engineering.

The witness stated that it was his opinion the player of the machine has no control over the descent of the ball after it enters the playboard and that the "player control is limited to the extent that he can juggle the machine" without activating the tilt mechanism. It was demonstrated that there are various "features" by which the opportunities to score lessen or become greater over which the player has no control and may not have any knowledge. The coin box could hold $275 in nickels.

A state trooper was permitted to testify over objection that he had had twelve years of experience in playing bingo machines similar to the ones forfeited here; that he had played all of the machines here involved; that he had played similar machines in Texas, Georgia, the Philippines, and in five counties in Kentucky; that it was customary to make cash pay-offs for the free games won; and that he had never been refused a cash pay-off. Objection was made to his testimony because he had not played the machines in McCracken County, where these machines were seized.

The trial court admitted the testimony with an admonition, the pertinent part of which follows:

"* * * I * * * admonish the jury that the testimony of this witness that he

has played other machines and has been awarded * * * money for the games * * * he * * * won on other machines * * * (is) not evidence that you can consider in determining whether these machines * * * were used for gambling purposes * * * You may consider the evidence as * * tending to prove, if it does do so, that the machines were designed * * * or intended to be used for gambling purposes."

■ The trial court properly permitted such testimony as showing that the machines were intended for gambling purposes. 14 Console Type Slot Machines v. Commonwealth, Ky., 273 S.W.2d 582.

The machines were seized without warrants and pursuant to oral instruction from the chief of police of Paducah and the sheriff of McCracken County. The seizures were made shortly after the Internal Revenue Service released for publication a list of locations in McCracken County holding federal licenses issued under 26 U. S.C.A. Section 4461(a) et seq., for coin-operated gaming devices. All of the machines were in private places of business open to the general public, such as liquor stores, pool rooms, taverns, restaurants, and one gasoline service station. Each machine had a federal gaming stamp. No forcible entry was made to effect the seizure and no objection was made to any seizure at the time.

■ Lotteries, gift enterprises, and all similar schemes are forbidden. Kentucky Constitution, Section 226; KRS 436.360. See Commonwealth v. Douglass, 100 Ky. 116, 24 S.W. 233, 15 Ky.Law Rep. 581, affirmed 168 U.S. 488, 18 S.Ct. 199, 42 L.Ed. 553.

■ The word "lottery" is derived from the Italian word "lotto," meaning lot or chance. Lotto was a form of political election originating in Genoa about 1530. Webster's New International Dictionary, Second Edition; Encyclopedia Britannica, Volume 14, page 405. The elements of "lottery" are a prize, an award thereof by chance, and a consideration. Minges v. City of Birmingham, 251 Ala. 65, 36 So.2d 93. The word "lottery" is a generic term and embraces all schemes for distribution of prizes by chance for consideration, including bingo. Nadlin v. Starick, Ohio Com.Pl., 194 N.E.2d 81. Bingo, beano, keno, and lotto are all names for "lottery." Society of Good Neighbors v. Van Antwerp, 324 Mich. 22, 36 N.W.2d 308; Bender v. Arundel Arena, Inc., 248 Md. 181, 236 A.2d 7; People v. Kiefer, 173 Misc. 300, 16 N.Y.S.2d 858. The "numbers game" has been held to be a lottery. Gilley v. Commonwealth, 312 Ky. 584, 229 S.W.2d 60, 19 A.L.R.2d 1224. The above definition of a "lottery" has been approved. Commonwealth v. Malco-Memphis Theatres, Inc., 293 Ky. 531, 169 S.W.2d 596. As so defined, there can be no doubt that the machines involved here are lotteries by whatever name or names they may be called, and as such are gambling devices and are so intended. See Three One-Ball Pinball Machines v. Commonwealth, Ky., 249 S.W.2d 144, upholding the confiscation of similar machines. Cf. City of Owensboro v. Smith, Ky., 383 S.W.2d 902, wherein it was noted that "pinball machines may be operated in various ways and * * * they can easily be adapted or converted to gambling purposes."

KRS 436.230 specifically forbids the "setting up, keeping, managing, operating or conducting a keno bank, faro bank or other machine or contrivance used in betting" and fixes severe punishment for violation of the statute. KRS 436.230(3) provides: "The change of the name of any of the games, banks, tables, machines or contrivances * * * shall not prevent" a conviction. The conclusion is inescapable that the Legislature intended to condemn all forms of lottery, however named, in obedience to the constitutional mandate. No contention is made, nor doubtless could meritoriously have been made, that the

machine in question falls in the category of a game of skill. See KRS 436.230 (5).

■ KRS 436.280, under which these machines were seized, authorizes the seizure without a warrant of "Any bank, table, contrivance, machine or article used for carrying on a game prohibited by KRS 436.230." The officers were authorized to enter such public places of business. A federal gambling license was displayed in each place. Inasmuch as these machines were seized in places frequented by the public and were in open view, readily observable by an officer, no merit is recognized in the contention that the seizures were illegal. Clark v. Commonwealth, Ky., 388 S.W.2d 622; Commonwealth v. Johnson, Ky., 420 S.W.2d 103; Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726. Nor is there any merit in the argument that the officers acted on "hearsay." The hearsay, if any, and the circumstances here furnish a substantial basis of probable cause sufficient to sustain the search. Aguilar v. State of Texas, 378 U. S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684.

■ Six of the owners of the business establishments from which the machines were seized testified concerning seven of the machines. Each testified that the machine, or machines, in his possession had not been used for gambling and that he had no such intention. It is contended in their behalf that no one contradicts this testimony; therefore, their motion for a directed verdict should have been sustained. When the other testimony is considered, the jury was justified in finding that the machines were intended for gambling and in disbelieving appellants' testimony. Hickerson v. Commonwealth, 283 Ky. 81, 140 S.W.2d 841.

Judgment affirmed.

WILLIAMS, C. J., and EDWARD P. HILL, MILLIKEN and PALMORE, JJ., concur.