Troy HARRIS, et al., Appellant,

v.

The MISSOURI GAMING COMMISSION,
et al., Respondents.

No. 76123.

Supreme Court of Missouri,
En Banc.

Jan. 25, 1994.

As Modified on Denial of Rehearing
Feb. 22, 1994.

Curtis E. Woods, Terry W. Shackmann, David L. Black, Kenneth A. Schifman, Kansas City, Richard S. Brownlee, III, Mary D. Winter, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Don Downing, Deputy Asst. Atty. Gen., Michael L. Boicourt, Orval E. Jones, Asst. Attys. Gen., Jefferson City, W. Stanley Walch, James W. Erwin, Lawrence C. Friedman, Matthew J. Fairless, St. Louis, for respondents.

BENTON, Judge.

On April 28, 1993, the General Assembly enacted S.B. 10 & 11 "relating to the regulation of certain gaming activities" (the "Act"). Previously at the general election on November 3, 1992, the People approved a referendum law H.B. 149 "relating to certain gaming activities."[1] The General Assembly, howev-

---

1. The ballot title for H.B. 149 placed before each voter stated: "Proposition A.—Authorizes riverboat gambling excursions on the Mississippi and Missouri Rivers, regulated by the State Tourism Commission. Excursions may originate where locally approved by voters. Five hundred dollar

er, in its Act repealed almost all of H.B. 149. The Act created a Gaming Commission to regulate riverboat gambling—previously done by the Tourism Commission under H.B. 149. § *313.004 RSMo Supp.1993.*[2] The Act also deleted H.B. 149's non-severability clause, and H.B. 149's preferences for Missouri products and workers. § *313.850, deleting § 21.4 of H.B. 149; § 313.812.4, deleting § 6.4 of H.B. 149.* The Act continued special exemptions from licensing requirements for certain stretches of the Mississippi riverbank and for certain boats (though the Act, for the first time, allowed all riverboats to be permanently docked.) §§ *313.805(15), 313.812.3.* The Act essentially maintained H.B. 149's definition of riverboat gambling games. § *313.800(8).*

On April 30, 1993—one day after the Governor approved the Act—Troy Harris, plaintiff, filed a first amended petition for declaratory judgment that the Act was unconstitutional in violation of the Missouri Constitution, Article III, §§ 39(9), 40(28), and 40(30). Defendants filed motions to dismiss; no evidentiary hearing has yet been held. On July 14, 1993, the circuit court ruled that plaintiff Harris was not entitled to the entry of a declaratory judgment in his favor.

This Court reverses and remands for proceedings consistent with this opinion.

### I.

■ Defendants challenge the standing of plaintiff Harris. In his petition, Harris—"a taxpayer and registered voter in this state"—attacks the "expenditure of state taxpayer funds from the general revenue and other public funds and state resources, including the time and effort of state officials who are paid by state funds to carry out their various duties under the Act."

For the fiscal year ending June 30, 1994, the General Assembly transferred from the state treasury $3 million for "start-up costs" of the Gaming Commission. *H.C.S.S.B. 419, 87th General Assembly (1993) (§ 020).* De-

fendants stress that the General Assembly intends that riverboat fees reimburse the treasury. *Id. (§ 025)* However, such reimbursement need not occur before July 1, 1995. § *313.835 enacted as § 16, S.B. 10 & 11, 87th General Assembly (1993).*

In analogous circumstances, a taxpayer had standing to attack Missouri's entry into the multistate lottery. *Tichenor v. Missouri State Lottery Com'n,* 742 S.W.2d 170, 172 (Mo. banc 1988). Following *Tichenor,* this Court held that a taxpayer has standing to challenge an alleged illegal spending of public funds *if* there is "a direct expenditure of funds generated through taxation...." *Eastern Mo. Laborers District Council v. St. Louis County,* 781 S.W.2d 43, 47 (Mo. banc 1989) (citing eight of this Court's opinions spanning 120 years). Plaintiff Harris alleges a direct expenditure of funds generated through taxation. Based on the petition, plaintiff has standing.

### II.

■ Harris first contends that S.B. 10 & 11 violates Article III, § 39(9) of the Missouri Constitution: "The general assembly shall not have the power ... to authorize lotteries or gift enterprises...." The parties agree that this constitutional prohibition does not apply to a proper constitutional amendment. *See Payne v. Kirkpatrick,* 685 S.W.2d 891, 903 (Mo.App.1984), *approved in Barnes v. Bailey,* 706 S.W.2d 25, 30 (Mo. banc 1986). Defendants assert that this prohibition also does not apply to S.B. 10 & 11.

S.B. 10 & 11 was enacted by the General Assembly and approved by the Governor. The enacting clause of S.B. 10 & 11 follows the constitutional mandate for the style of the laws of this State: "Be it enacted by the General Assembly of the State of Missouri, as follows." *Mo. Const. Art. III, § 21.*

S.B. 10 & 11 explicitly "repeal[s]" the referendum law, H.B. 149, enacted by the Gen-

---

maximum loss limit per person per excursion. The proposal is intended to produce increased General Revenue." *Laws of Missouri 1992,* 2d Session, 86th General Assembly 1225 (including full text of H.B. 149).

2. All statutory references to the Act are to RSMo Supp.1993.

eral Assembly and approved by the voters.[3] The power to repeal or modify a referendum law is within the power of the legislature. *State ex rel. Drain v. Becker,* 240 S.W. 229, 232 (Mo. banc 1922). Enactment of a referendum law does not "deprive any member of the General Assembly of the right to introduce any measure," including S.B. 10 & 11. *See Mo. Const. Art. III, § 52(b).*

The challenged law, S.B. 10 & 11, is clearly an act of the General Assembly, and thus subject to the limitations in Article III, § 39(9). The referendum law, H.B. 149, is not challenged in this suit and is therefore irrelevant.

Defendants claim that S.B. 10 & 11 is not a "new enactment" but simply a "continuation" of H.B. 149, and thus by § 1.120 RSMo 1986, this Court must review H.B. 149 on this appeal. Even assuming that § 1.120 applies, H.B. 149 and S.B. 10 & 11 are significantly different. S.B. 10 & 11 creates a Gaming Commission and a new riverboat gambling regulatory scheme, introduces a different regulator for charitable bingo, deletes requirements that riverboats use Missouri products and employees, dedicates tax revenue from riverboats to a different fund and use, repeals the limit on the percentage of the boat's space used for gambling, provides severability for the separate provisions of the law, and changes various other elements previously in H.B. 149. *See §§ 313.004, 313.005(3), 313.800–313.850.*

Defendants particularly stress the similarity of the definition of "gambling game" in both S.B. 10 & 11 and H.B. 149, as well as other authorizing provisions common to both laws. *Compare § 313.800(8) with § 1(10) of H.B. 149.* However, even in these provisions, the General Assembly changed the wording from that in H.B. 149. S.B. 10 & 11 is a new enactment of the General Assembly subject to Article III, § 39(9) of the Constitution.

### III.

■ It has been generally acknowledged that there is no fixed technical or legal meaning of the term "lottery" and that the term must be construed in a popular sense. *State ex inf. McKittrick v. Globe–Democrat Publishing Co.,* 341 Mo. 862, 110 S.W.2d 705, 713 (Mo. banc 1937); *State v. Mumford,* 73 Mo. 647, 650 (Mo.1881); 38 Am.Jur.2d *Gambling* § 5 (1968). There is also ample authority describing the rationale for singling lotteries out from other forms of gambling. In 1970 this Court, citing the United States Supreme Court, said:

We decline the opportunity to dilute the established laws prohibiting all lotteries in Missouri. Our view finds strong support in *Lucky Calendar Co. v. Cohen,* [19 N.J. 399] 117 A.2d 487, 492–93 (N.J.1955), wherein Chief Justice Vanderbilt said:

'Of all the forms of gambling, lotteries have been the most condemned by the courts. Over a century ago the United States Supreme Court unanimously condemned their anti-social effects in comparison with ordinary gambling in sweeping terms that reflected judicial experience generally with lotteries:

'Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.' *Phalen v. Commonwealth of Virginia,* [49 U.S.] 8 How. 163, 168, 12 L.Ed. 1030, 1033 (1850).

The lure of the chance for 'easy money' has not changed in the intervening century. The enormous profits to be had from lotteries have attracted the devious ingenuity of those who seek to profit by catering to the weakness of those whom the statute aims to protect, primarily for the benefit of society in general.

*Mobil Oil Corp. v. Danforth,* 455 S.W.2d 505, 509 (Mo. banc 1970).

---

**3.** S.B. 10 & 11 begins: "AN ACT to repeal ... sections 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 16, 17, 18, 19, and 21 of conference committee substitute for senate committee substitute for house committee substitute for house bill no. 149 of the first regular session of the eighty-sixth General Assembly and approved by the voters of the state on November 3, 1992....''

Harris alleges that the games authorized by the Act are "lotteries" by Article III, § 39(9), of the Missouri Constitution:

> The general assembly shall not have the power: ... (9) Except as otherwise provided in section 39(b) or section 39(c) of this article, to authorize lotteries or gift enterprises for any purpose, and shall enact laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; except that, nothing in this section shall be so construed as to prevent or prohibit citizens of this state from participating in games or contests of skill or chance where no consideration is required to be given for the privilege or opportunity of participating or for receiving the award or prize and the term "lottery or gift enterprise" shall mean only those games or contests whereby money or something of value is exchanged directly for the ticket or chance to participate in the game or contest....

■ This Court has repeatedly held that the elements of a lottery are consideration, chance, and prize. *Mobil Oil Corp.*, 455 S.W.2d at 507; *State v. McEwan*, 343 Mo. 213, 120 S.W.2d 1098, 1099 (Mo. banc 1938); *McKittrick*, 110 S.W.2d at 713; *State ex rel. Home Planners Depository v. Hughes*, 299 Mo. 529, 253 S.W. 229, 230 (Mo. banc 1923). The Constitution itself adopts this definition: the term "lottery ... shall mean only those games or contests whereby money or something of value is exchanged directly for the ... chance to participate in the game...." *Mo. Const. Art. III*, § 39(9).

■ The parties do not dispute that "consideration" and "prize" are present in all riverboat games. The parties have focused principally on the relative role of "chance," as opposed to "skill," in riverboat games. This Court has long held that a game escapes the constitutional bar against lotteries if skill is predominant. *McKittrick*, 110 S.W.2d at 713; *State ex rel. Igoe v. Joynt*, 341 Mo. 788, 110 S.W.2d 737, 740 (Mo. banc 1937). Re-

cently, however, this Court stated that horse racing is not a "lottery" within the meaning of the Constitution. *Barnes v. Bailey*, 706 S.W.2d 25, 32 (Mo. banc 1986). *Barnes* particularly noted that the lottery prohibition was not intended to reach all gambling. *Id.*

Harris emphasizes *McKittrick* and its progeny. The defendants stress *Barnes* and its implications. However, reading *McKittrick* and *Barnes* together, a line exists to distinguish those forms of gambling that are lotteries, and those, like horse racing, that are not lotteries.

Lottery, when defined solely by consideration, chance, and prize, sweeps too broadly and does not distinguish between lotteries and other forms of gambling. While "prize" and "consideration" are not at issue, "chance" is central and is defined as "something that happens unpredictably without any discernible human intention or direction...." *Webster's Third New International Dictionary* 373 (1976). Therefore, if skill is present in a game, there is human intention or direction and pure chance is not present. The Constitution specifically recognizes games of skill, as opposed to games of chance. *Mo. Const. Art. III*, § 39(9) (defining games of "skill or chance.")

■ From an individual player's perspective, a lottery is a form of gambling in which consideration is paid for an opportunity at a prize, where skill is absent or only nominally present. No player's choice or will has any part in the lottery's result, nor can human reason, foresight, sagacity, or design enable a player to affect the game.[4] Skill does not affect the probability of "winning." No one can be a better lottery player than anyone else (though players may buy more opportunities).

Games that are not "lotteries" have an element of skill. Skill increases the probabil-

---

**4.** *See Braddock v. Family Finance Corporation*, 95 Idaho 256, 258, 506 P.2d 824, 826 (Idaho 1973); *Lee v. City of Miami*, 121 Fla. 93, 163 So. 486, 488 (Fla.1935); *Waite v. Press Publishing Association*, 155 F. 58, 61 (Cir. 6 1907); *State v. Dalton*, 22 R.I. 77, 46 A. 234, 236 (R.I.1900); *Stevens v. Cincinnati Times–Star*, 72 Ohio St. 112, 73 N.E. 1058, 1060 (Ohio 1905); *Equitable Loan & Security Company v. Waring*, 117 Ga. 599, 44 S.E. 320, 345 (Ga.1903); *People ex rel. Ellison v. Lavin*, 179 N.Y. 164, 71 N.E. 753, 754–55 (N.Y. 1904).

ity of "winning." In skill games, one person can be a better player than others.[5]

### IV.

■ Section 1(8) of the Act defines the gambling games on Missouri riverboats:

"Gambling game," includes the following activities on an excursion gambling boat: baccarat, bingo, twenty-one, poker, craps, slot machine, video game of chance, roulette wheel, klondike table, punchboard, faro layout, keno layout, numbers ticket, push card, jar ticket, or pull tab which is authorized by the commission as a wagering device but does not include gambling on sporting events. *[codified as § 313.-800(8)]*

The petition describes each of these games.[6]

In *bingo*, a player receives a card upon which a five-by-five matrix of numbers is printed, with a center "free" position. The remaining 24 positions have a random distribution of numbers. Numbers are drawn randomly, one by one; players respond by covering the called number on the card. Any player who covers a designated configuration of numbers (vertically, horizontally, diagonally, etc.) wins or shares in a prize.

Bingo is a lottery by the terms of the Missouri Constitution. Under Article III, § 39(a), bingo is a lottery, unless it is conducted by an eligible organization under special restrictions, such as being conducted solely by volunteers. *Mo. Const. Art.* III, § 39(a)(3)(b). Other state courts have held bingo to be a lottery. *Pruitt v. Indiana,* 557 N.E.2d 684, 690–691 (Ind.App.1990); *Secretary v. St. Augustine Church,* 766 S.W.2d 499, 502 (Tenn.1989); *A.B. Long Music Co. v. Kentucky,* 429 S.W.2d 391, 394 (Ky.1968); *Society of Good Neighbors v. Van Antwerp,* 324 Mich. 22, 36 N.W.2d 308, 310 (Mich. 1949); *State ex rel. Schillberg v. Safeway Stores, Inc.,* 75 Wash.2d 339, 450 P.2d 949, 955 (Wash.1969); *Iowa v. Mabrey,* 245 Iowa 428, 60 N.W.2d 889, 893 (Iowa 1953); *Wisconsin v. Laven,* 270 Wis. 524, 71 N.W.2d 287, 290 (Wis.1955); *Army–Navy Bingo, Garrison No. 2196 v. Plowden,* 281 S.C. 226, 314 S.E.2d 339, 340 (S.C.1984).

In *keno layout,* a player picks a series of numbers on a card. A randomizing device then selects the winning numbers. If the numbers match, the player wins. Other states hold keno to be a lottery. *A.B. Long,* 429 S.W.2d at 394 (Ky.); *Society of Good Neighbors,* 36 N.W.2d at 309 (Mich.); *Mabrey,* 60 N.W.2d at 892–893 (Iowa).

In *numbers ticket,* the player may select, or have assigned randomly, a series of numbers. Players win by matching their numbers to those generated by a randomizing device. In other jurisdictions, numbers tickets are lotteries. *Arkansas v. Bass,* 224 Ark. 976, 277 S.W.2d 479, 480 (Ark.1955); *State ex rel. Olsen v. Crown Cigar Store,* 124 Mont. 310, 220 P.2d 1029, 1032 (Mont.1950).

In *pull tab,* the player receives a card upon which randomly-selected symbols are printed. The symbols are concealed by perforated pull tabs. The player pulls the tab and compares the pre-printed symbols to the predetermined winning configurations. If the configurations match, the player wins. Pull tabs are lotteries. *Contact, Inc. v. State,* 212 Neb. 584, 324 N.W.2d 804, 808 (Neb.1982); *Hendrix v. McKee,* 281 Or. 123, 575 P.2d 134, 139 (Or.1978); *37 Gambling Devices v. State,* 694 P.2d 711, 718–19 (Wyo.1985); *see Mobil Oil,* 455 S.W.2d at 507.

In *jar ticket,* a player draws a pull-tab card from a jar, near a notice indicating the number and size of prizes available. In *punchboard,* a player pushes out a covered part of a board with perforated designs. In *push card,* the player selects a specific concealed slot or tab on a card, and pushes or pulls

---

**5.** The record presented to us does not provide adequate information to formulate other tests that may distinguish lotteries from other forms of gambling. Analysis of such tests can occur only after a full trial.

**6.** Defendants concede on this appeal that the petition's descriptions of the games—repeated in the text below—are accurate, both by filing motions to dismiss at the trial court, *see Doss v.* *Doss,* 822 S.W.2d 427, 428 (Mo. banc 1992); *Murphy v. A.A. Mathews,* 841 S.W.2d 671, 672 (Mo. banc 1992), and by a statement at oral argument in this Court. *Trailiner Corporation v. Director of Revenue,* 783 S.W.2d 917, 920 (Mo. banc 1990); *Burlington Northern Railroad v. Director of Revenue,* 785 S.W.2d 272, 274 (Mo. banc 1990).

aside the cover. In all three of these games, a configuration of randomly-assigned symbols is revealed. If the configuration matches a pre-determined winning configuration, the player wins a prize. Punchboards, jar tickets, and push cards are lotteries. *Callison v. State,* 146 S.W.2d 468, 469 (Tex. Civ.App.1940); *State ex rel. Harrison v. Deniff,* 126 Mont. 109, 245 P.2d 140, 141 (Mont.1952); *State v. Brown,* 173 Kan. 166, 244 P.2d 1190, 1194 (Kan.1952); *State v. Hudson,* 128 W.Va. 655, 37 S.E.2d 553, 559 (W.Va.1946).

In sum, bingo is defined by the Missouri Constitution as a lottery and another version of bingo, keno, necessarily falls within the lottery definition. Numbers tickets, pull tabs, jar tickets, push cards, and punchboards clearly have no element of skill, as demonstrated by their similarity to the Missouri State Lottery's games. *See* 12 *C.S.R.* 40–95 (1990) (pull tabs); 12 *C.S.R.* 40–90 (1988) (scratch off games similar to push-cards, punchboards and jar tickets); 12 *C.S.R.* 40–85.110–.170 (1993) ("Pick–3" Missouri lottery games like numbers tickets). In the games of bingo, keno, numbers ticket, pull tab, jar ticket, push card, and punchboard, skill does not affect the probability of winning. These games are all lotteries within the meaning of Article III, § 39(9), of the Missouri Constitution.

■ Some of the remaining games in the Riverboat Gambling Act involve skill and thus are not prohibited by Article III, § 39(9) of the Missouri Constitution. The parties agree *poker* is a game of skill. In another card game, a *twenty-one* player plays against the house dealer. Each initially receives two cards, with only one visible to the other player. Each player may take additional cards. The goal is to get a score of card values closest to (without going over) 21. In his petition, Harris alleges that twenty-one involves "considerable skill," and that there are "skilled blackjack [twenty-one] players." Twenty-one and poker are not lotteries and are therefore constitutionally permissible on riverboats.

■ Between games with no element of skill and those involving skill lie the seven remaining games. *Slot machines*—random matching of symbols with predetermined configurations for a payoff—involve no skill. Almost all other state courts have held slot machines to be lotteries. *Idaho v. Village of Garden City,* 74 Idaho 513, 265 P.2d 328, 332 (Idaho 1953); *State ex rel. Evans v. Brotherhood of Friends,* 41 Wash.2d 133, 247 P.2d 787, 796 (Wash.1952); *Montana v. Marck,* 124 Mont. 178, 220 P.2d 1017, 1018 (Mont. 1950); *Thompson v. Ledbetter,* 74 Ga.App. 427, 39 S.E.2d 720, 721 (Ga.1946); *Oregon v. Coats,* 158 Or. 102, 74 P.2d 1120 (Or.1938); *State v. Barbee,* 187 La. 529, 175 So. 50, 57 (La.1937); *Massachusetts v. McClintock,* 257 Mass. 431, 154 N.E. 264, 265 (Mass.1926); *Queen v. Texas,* 93 Tex.Crim. 173, 246 S.W. 384, 386 (Tex.Crim.App.1922); *North Carolina v. Lowe,* 178 N.C. 770, 101 S.E. 385, 389 (N.C.1919); *Loiseau v. Alabama,* 114 Ala. 34, 22 So. 138, 139 (Ala.1897); *but see Ex parte Pierotti,* 43 Nev. 243, 184 P. 209, 210 (Nev.1919) *and Lee,* 163 So. at 490. In addition, the petition describes various "video slot machines" that may replicate games of skill (such as poker). Because the petition is unclear as to the presence of skill, these newer games necessitate an evidentiary hearing as to the element of skill in all slot machine games.

■ The Act also references six other games: *baccarat, craps, roulette wheel, klondike table, faro layout,* and *video games of chance.* The petition alleges that each of these games involves "pure chance" in one part of the game. The petition, however, does not discuss, let alone negate, the role of skill in all parts of these games.

This Court remands to the circuit court for determinations consistent with this opinion as to the particular characteristics of the seven remaining games.[7]

*V.*

Harris next challenges sections 6(3) and 3(15) of the Act as special or local laws prohibited by Article III, §§ 40(28) and (30)

7. In regard to the scope of the remand, also see footnote 5.

of the Missouri Constitution. Section 6(3) [8] specifically exempts the Admiral and other boats near Eads Bridge from the requirement that riverboat casinos resemble Missouri's riverboat history. Section 3(15) [9] automatically exempts the Admiral and other boats near Eads Bridge from the requirement that riverboats cruise. All other riverboats must cruise unless exempted by the Gaming Commission. *§ 313.805(15).*

Article III, Section 40 of the Constitution prohibits the General Assembly from passing any local or special law ... "(28) granting to any corporation, association, or individual any special or exclusive right, privilege or immunity ... [or] (30) where a general law can be made applicable...."

As discussed in section II above, S.B. 10 & 11 is an act of the General Assembly and is therefore subject to Article III, § 40 of the Constitution.

■■■ The determination whether a statute is a special law under § 40(30) rests on whether it is "open-ended." *State ex rel. City of Blue Springs v. Rice,* 853 S.W.2d 918, 920–21 (Mo. banc 1993); *O'Reilly v. City of Hazelwood,* 850 S.W.2d 96, 99 (Mo. banc 1993).

Classifications are considered open-ended if it is possible that the status of members of the class could change. *See Blue Springs,* 853 S.W.2d at 921. Classifications based on historical facts, geography, or constitutional status focus on immutable characteristics and are therefore facially special laws. *Id.; School District of Riverview Gardens v. St. Louis County,* 816 S.W.2d 219, 222 (Mo. banc 1991).

■■■ S.B. 10 & 11 designates the Admiral and the Eads Bridge area by geographic location (a specific stretch of the Mississippi riverbank in St. Louis), *and* by the precise size and type of boat (double side-wheel railroad ferry, four hundred and sixty feet long and ninety feet wide). These immutable characteristics, according to plaintiff's petition, describe only the Admiral and the Eads Bridge area. Clearly, the Act was intended to cover the Admiral and the Eads–Bridge–area boats, and no other vessels. S.B. 10 and 11 is a facially special law under Article III, § 40(30).[10]

■■■ The unconstitutionality of a special law is presumed. *City of Blue Springs,* 853 S.W.2d at 921; *State ex rel. Public Defender. Commission v. County Court of Greene County,* 667 S.W.2d 409, 413 (Mo. banc 1984). The party defending the facially special statute must demonstrate a "substantial justification" for the special treatment. *City of Blue Springs,* 853 S.W.2d at 921; *See*

---

**8.** Section 6(3) provides: "The commission shall require, as a condition of granting a license, that an applicant to operate an excursion gambling boat, develop, and as nearly as practicable, re-create boats that resemble Missouri's riverboat history, except that a vessel built as a double side-wheel railroad ferry and which is continuously docked in an area four hundred sixty feet long and ninety feet wide on the Mississippi River, in any city not within a county or a vessel which is continuously docked within six hundred fifty feet north and one thousand three hundred feet south of the Eads Bridge across the Mississippi River in any city not within a county shall automatically satisfy such requirement." *[codified as § 313.812.3].*

**9.** Section 3(15) provides: "Excursion gambling boats shall cruise, unless the commission finds that the best interest of Missouri and the safety of the public indicate the need for continuous docking of the excursion gambling boat in any city or county ... The commission shall base its decision to allow continuously docked excursion gambling boats on any of the following criteria: the docking location or the excursion cruise could cause danger to the boat's passengers, disruption of interstate commerce or possible interference with railways transportation. In addition, in any city or county other than a city not within a county, the commission shall consider economic feasibility or impact that would benefit land based development and permanent job creation. The commission shall not discriminate among applicants for continuous docking excursion gambling that are similarly situated with respect to the criteria set forth in this section; however, if a vessel built as a double side-wheel railroad ferry which is continuously docked in an area approximately four hundred sixty feet long and ninety feet wide on the Mississippi River, in any city not within a county, or a vessel which is continuously docked within six hundred fifty feet north and one thousand three hundred feet south of the Eads Bridge across the Mississippi River in any city not within a county is licensed by the commission pursuant to provisions of section 1 to 23 it shall qualify for a continuously docked operation." *[codified as § 313.805(15)].*

**10.** There is thus no reason to analyze the Act under Article III, § 40(28).

also *State ex rel. Bunker Resource Recycling and Reclamation, Inc. v. Mehan,* 782 S.W.2d 381, 385 (Mo. banc 1990).

Defendants invoke *State ex rel. Wagner v. St. Louis County Port Authority,* 604 S.W.2d 592 (Mo. banc 1980). There, the law provided that St. Louis and Kansas City automatically qualify as port authorities while other municipalities had to apply to the state transportation commission to establish an authority. In an original action, this Court determined that the legislature applied its statutory criteria for granting port authorities evenly, and thus that Kansas City and St. Louis qualified. In essence, this Court held that while the statute was facially a special law, the state had demonstrated a substantial justification for the classification of St. Louis and Kansas City.

This case is still at the motion-to-dismiss stage; therefore, the defendants have had no opportunity to demonstrate a substantial justification for the special law. On remand, the defendants have the burden to show a substantial justification that the Admiral and the specific stretch of the Mississippi around Eads Bridge are singled out based upon a even-handed application of the statutory criteria for the exemption from cruising.

The statute, however, has no criteria for exempting boats from the requirement to resemble Missouri riverboat history. Other boats may not even apply to avoid this requirement. On remand, the defendants must show a substantial justification for treating the St. Louis boats different from all other boats, regarding their appearance.

## VI.

The circuit court's judgment is reversed and the case remanded for proceedings consistent with this opinion.[11]

11. Section 23 of S.B. 10 & 11 provides: "Provisions of sections 1 to 23 are severable. If any provision of sections 1 to 23 of this act is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions are valid except to the extent that the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accor-

COVINGTON, C.J., HOLSTEIN, THOMAS, PRICE and LIMBAUGH, JJ., and FLANIGAN, Special Judge, concur.

ROBERTSON, J., not sitting.

dance with the legislative intent." *§ 313.850, § 23, S.B. 10 & 11, 87th General Assembly (1993).* At this point, major issues regarding S.B. 10 & 11 await the remand, and there is no evidence as to the capability of executing the Act in the absence of the invalidated provisions. It is premature to make any findings regarding severability.